*Dancy v. McGinley*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2015

(Argued: May 2, 2016      Decided: December 7, 2016)

Docket Nos. 15-140-cv(L); 15-1876-cv(CON); 15-1950-cv(XAP)

JARQUEZ DANCY,

*Plaintiff-Appellant,*

JAYVON ELTING,

*Plaintiff-Appellee,*

*v.*

POLICE OFFICER GREGG MCGINLEY,

*Defendant-Appellant,*

POLICE OFFICER JOHN WILLIAMS,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Before:
LIVINGSTON, CHIN, AND CARNEY, *Circuit Judges*.

---

Consolidated appeals from judgments and orders of the United States District Court for the Southern District of New York (Smith, *M.J.*), in this civil rights case brought pursuant to 42 U.S.C. § 1983, (1) awarding damages of $196,500, as remitted, in favor of plaintiff-appellee Jayvon Elting against defendant-appellant Police Officer Gregg McGinley, and (2) denying plaintiff-appellant Jarquez Dancy's motion for a new trial following the jury's verdict in favor of defendant-appellee Police Officer John Williams.

AFFIRMED IN PART AND VACATED AND REMANDED IN PART.

---

> STEPHEN BERGSTEIN, Bergstein & Ullrich, LLP, Chester, NY, *for Plaintiff-Appellee Jayvon Elting*.
>
> CHRISTOPHER D. WATKINS, Sussman & Watkins, Goshen, NY, *for Plaintiff-Appellant Jarquez Dancy*.
>
> JOHN M. MURTAGH (Denise M. Cossu, *on the brief*), Gaines, Novick, Ponzini, Cossu & Venditti, LLP, White Plains, NY, *for Defendant-Appellant Police Officer Gregg McGinley and Defendant-Appellee Police Officer John Williams.*

---

CHIN, *Circuit Judge*:

On Friday, October 2, 2009, around 11 p.m., two high school students, Jarquez Dancy and Jayvon Elting, were walking on Main Street in Poughkeepsie, New York. They had been watching a movie at a friend's house, and were returning to Dancy's home, where Elting was to be picked up by his mother.

Police Officer Gregg McGinley stopped them. Both Dancy and Elting are African American, and there had been a report over the police radio of a robbery a few blocks away, with a description of the assailant: "Thin black male, brown jacket." Other officers (including Police Officer John Williams) arrived, and a confrontation ensued that left Elting bruised, scraped, and swollen, and Dancy with a broken jaw. Elting was arrested for obstruction of governmental administration, resisting arrest, and possession of a controlled substance; Dancy was arrested for attempted robbery. Both spent the night in jail before being released the next evening to their respective mothers. The attempted robbery charge against Dancy was eventually dropped. Elting agreed to an adjournment in contemplation of dismissal.

Elting and Dancy brought a civil rights action in federal district court alleging, *inter alia*, false arrest and use of excessive force. At trial, before the case was submitted to the jury, the district court entered judgment as a matter of law in favor of Elting on liability as to his claims against McGinley for false arrest and use of excessive force, and thereafter the jury awarded him $215,000, which the district court remitted to $196,500. The jury found in favor of Williams on Dancy's claim for false arrest, but was unable to reach a verdict on Dancy's excessive force claim. At a second trial, the jury found in favor of Williams on Dancy's excessive force claim. The district court denied Dancy's motion for a new trial. McGinley and Dancy appeal.

We affirm the judgment in favor of Elting and the amount of damages, but vacate the judgment in favor of Williams and remand for a new trial on Dancy's excessive force claim.

*BACKGROUND*

I. *The Facts*

We recount the facts with the following principles in mind. With respect to Elting's claims against McGinley, we view the evidence from the first trial in the light most favorable to McGinley and draw all reasonable factual inferences in his favor, as the district court granted judgment against him on

-4-

liability as a matter of law. *See Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000). In determining whether the jury awarded excessive damages, however, "we 'view the evidence and draw all factual inferences in favor of [Elting],' and we 'accord substantial deference to the jury's determination of factual issues.'" *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 683 (2d Cir. 1993) (first quoting *Wheatley v. Ford*, 679 F.2d 1037, 1039 (2d Cir. 1982), and then quoting *Martell v. Boardwalk Enters., Inc.*, 748 F.2d 740, 750 (2d Cir. 1984)).

As to Dancy's claims against Williams, we assess only the legal accuracy of the jury instruction, and will reverse upon a finding of error only where, "based on a review of the record as a whole, the error was prejudicial or the charge was highly confusing." *Hudson v. New York City*, 271 F.3d 62, 67-68 (2d Cir. 2001) (alteration omitted) (quoting *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1345 (2d Cir. 1994)); *see also Cobb v. Pozzi*, 363 F.3d 89, 118 (2d Cir. 2003) (concluding that error in jury instruction was not harmless where "th[e] evidence could support a jury's reaching the opposite conclusion" had it been instructed correctly).

A.   *Overview*

Some basic facts are undisputed. On the evening of October 2, 2009, Elting and Dancy, seventeen and eighteen years old, respectively, and both in

high school, were walking on Main Street in Poughkeepsie, New York. They had been watching a movie at a friend's house and were walking back to Dancy's home, where Elting was to be picked up by his mother. Dancy was wearing a camouflage-patterned coat, with green, light green, and brown patches.

McGinley and Williams were police officers employed by the Poughkeepsie Police Department. McGinley decided to stop Elting and Dancy after hearing a radio transmission about an attempted robbery nearby. McGinley had informed other officers over the radio that he was going to stop a suspect, and, approximately ten seconds later, Williams arrived as McGinley made contact with the two teenagers. Williams led Dancy to the nearby patrol car, while McGinley engaged in a dialogue with Elting. Altercations ensued. McGinley arrested Elting for obstruction of governmental administration, resisting arrest, and criminal possession of a controlled substance in the seventh degree for crack cocaine allegedly found in Elting's pocket during the course of the arrest.[1] Dancy was arrested for attempted robbery after the robbery victim was brought to the scene and identified Dancy as his assailant.[2]

---

[1]     At trial, McGinley testified that an officer found "a little black bag, a tiny little mesh bag" containing crack cocaine. J. App. 376. Elting denied that he had ever possessed or used crack cocaine. Whether he was in possession of crack cocaine on the night in question is not relevant to the issues before us.

[2]     The victim was brought to the area where the "two subjects" were

Both Elting and Dancy were detained overnight until they were bailed out by their mothers the following evening. They both visited the hospital for injuries the day after being released from jail. Medical records show that Elting was in pain and had bruises and abrasions on his face, head, and torso. A CAT scan revealed no fractures and his injuries healed within two to three weeks. Dancy was diagnosed with a fractured jaw, which required surgery. His jaw was wired shut for six weeks.

The attempted robbery charge against Dancy was later dismissed in the interest of justice. Elting received an adjournment in contemplation of dismissal for all three charges.

### B. *Elting's Claims Against McGinley*

#### i. *The Stop and Arrest*

At approximately 11:00 p.m. that evening, Officer Craig arrived at City Center Deli, where he spoke with the victim of an attempted robbery that had occurred some minutes prior. The victim had been struck in the head and knocked to the ground. The victim provided Craig with a description of the

---

detained. J. App. 419. While the victim remained in a police car, a spotlight was put on "the suspect," to "illuminate[]" him. J. App. 419. He was handcuffed behind the back. Officer Craig then asked the victim "if this was the person who had committed the crime." J. App. 420. Officer Craig testified that the victim identified the illuminated suspect as his assailant. J. App. 420. Dancy challenged the on-site identification and denied participation in the robbery.

assailant, and Craig broadcast it over the police radio: "Thin black male, brown jacket." J. App. 431. The description orally transmitted by Craig over the radio was recorded by a civilian dispatcher in a dispatch narrative report.[3] According to the dispatch report, the transmission was sent at 11:02 p.m.

Officer McGinley had been out patrolling in his marked police vehicle when heard over his radio that a robbery had taken place at City Center Deli, located at 472 Main Street, and a suspect was at large. Upon hearing the report, McGinley drove towards the crime scene. On the way, he saw two young African-American men walking west on Main Street, in a direction away from City Center Deli.[4] He believed one of them (later identified as Dancy) "somewhat matched" the suspect's description. J. App. 280. McGinley kept an eye on them as they turned south onto South Hamilton Street, and then east onto Cannon Street, back towards City Center Deli. He was waiting for "some personal

---

[3] Craig testified that everything transmitted over the radio is documented in the dispatch narrative report and that, other than the "[t]hin black male, brown jacket" description that appears in the report, he did not broadcast any further description. McGinley disagreed with Craig's assertion that statements broadcast over the radio would always end up in the dispatch report. Although there was some suggestion at trial by McGinley that the broadcast description included a reference to dreadlocks, in fact McGinley did not clearly testify as to what he heard by way of a description and on appeal he does not rely on the existence of dreadlocks.

[4] According to Elting, he and Dancy were walking east on Main Street for one block -- toward City Center Deli -- before turning south on Hamilton Street and then continuing east on Cannon Street, where Dancy lived.

observation to go with the description." J. App. 282. While he was following them in his police car, he found it suspicious that they "looked over their shoulders numerous times" at the car. J. App. 301. At that point, he considered Dancy a "suspect" and Elting a "subject, a person of interest" because Elting had looked over his shoulder at the police car "numerous times," and because he was in the "presence of a suspect." J. App. 300-01.

McGinley radioed his intention to stop a possible suspect near 134 Cannon Street. He then pulled over, exited his vehicle, and approached Dancy and Elting. He "asked them if [he] could talk to them for a minute," and told them that Dancy fit the description of a suspect. J. App. 282.

Officer Williams was on duty in the area and arrived on the scene almost immediately, approximately ten seconds after McGinley. When he arrived, he led Dancy away from Elting toward the nearby police car. Williams ordered Dancy to place his hands on the hood of the car.

Elting began using a cell phone. McGinley instructed him not to use the phone. When Elting did not put the phone away, McGinley told him three more times -- in a louder, more commanding voice, and with a "changed" "demeanor" -- not to use the phone. J. App. 370. They were within one or two feet of each other at the time. McGinley did not want Elting to use his phone,

because it was "just not safe for [him]self, the cellphone in the hand." J. App. 299. His "immediate concern" was that the phone would be "potentially thrown at [him]," J. App. 371, or used "in [his] hand . . . as a weapon," J. App. 299. His secondary concern was the possibility that Elting would call someone, which in his experience had "not worked in [his] favor." J. App. 371-72. He feared that a potential robbery participant would "make a phone call and . . . obstruct the investigation portion of it." J. App. 300.

After the fourth command to stop using the phone, McGinley "put [his] left hand to [Elting's] back to direct him toward the police car." J. App. 372. When McGinley put his hand on Elting's back, McGinley claims Elting "attempted to run" by "turn[ing] in a 180-degree fashion the opposite direction and [taking] approximately two steps." J. App. 373. Elting denied attempting to run away at any point. McGinley "still had [his] hand in the area of [Elting's] back and was able to grab his waistband." J. App. 373. They "fell" unintentionally. J. App. 373. There was a "short struggle" on the ground as McGinley and another officer attempted to cuff Elting. J. App. 375. They succeeded in doing so.

McGinley characterized Elting's conduct as an attempt to flee and a failure to comply with a pat-down frisk. At that point -- when Elting assertedly

-10-

attempted to flee, but not prior -- McGinley believed he had probable cause for an arrest. McGinley also testified that when they "fell" to the ground, "an arrest was happening" for obstruction of governmental administration. J. App. 448. He construed Elting's actions on the ground as resisting arrest. The obstructing governmental administration charge was based on "noncompliance," *i.e.*, "the action of not complying with not using his cell phone, the attempt to flee and then the little resisting arrest incident on the ground." J. App. 306.

### ii. *Elting's Account*

Elting testified that, after McGinley stopped them and said that he suspected Dancy of criminal activity, Elting took out his phone to call his mother -- a local corrections officer. McGinley told him to put his "fucking phone away." J. App. 130. McGinley then grabbed Elting by his left arm and spun him around to the ground. Elting landed on his shoulder and his face hit the ground. McGinley twisted Elting's left arm behind his back, and pressed his knee into Elting's back. At the time, McGinley weighed between 205 and 220 pounds while Elting weighed 140 pounds. Other officers arrived and began punching Elting in the back while he was on the ground. Dancy testified that he saw McGinley punch Elting in the ribs while Elting was held to the ground. Another officer punched Elting in the face, causing his head to hit the pavement. He was

-11-

then handcuffed and lifted up, at which point he saw another officer pointing a gun toward him.

At the station, Elting was interrogated about the robbery and detained for about eighteen hours. He was eventually bailed out of jail the next evening by his mother, who took him to Saint Francis Hospital the following morning. He was in pain and had bruises and abrasions on his head, face, and torso. There was swelling on the right side of his head and left side of his face. The hospital conducted a CAT scan and chest x-ray, which revealed no fractures. The emergency room medical records confirm the bruising to the right side of head, face, and torso, with the recommendation to allow for natural healing and to take Advil to relieve pain. Its physical assessment documented the following: left eye pain, head pain, bruising on cheeks, elbow, back, swelling of his head and temporal area, tender upper and lower back, and abrasions to his nose and hand. Two days later, Elting began complaining of pain while urinating, and his mother took him to see his regular physician. Elting reported the same injuries as well as long-lasting migraine headaches and soreness. He reported back pain over his right kidney. His physical injuries healed after two to three weeks.

Elting missed a week of school as a result of the incident. His grades "dropped a little bit," but he brought them back up and graduated, with honors,

from high school. J. App. 147. He sought counseling. Elting testified that the experience "changed [his] outlook on a lot of things," and that he lost "trust [in] the police" and his mother's coworkers at the Dutchess County Correctional Facility. J. App. 148. At the time of trial, he continued to seek counseling as a result of the incident because he "always expect[s] the worst to happen." J. App. 150.

Elting's mother testified that prior to the incident, Elting was outgoing, dependable, responsible, positive, and did well in school. Afterwards, he was, at first, very angry and "had a lot of questions as to . . . people who got arrested and came in contact with the police" that she could no longer answer for him. J. App. 354. He also "became distant," stopped going out, and began "isolat[ing] himself" in his room. J. App. 354. She described his reactions as tense, angry, fearful, and distant.

C.    *Dancy's Claims Against Williams*

Dancy and Officer Williams were acquainted with each other because Williams was employed as a part-time security guard at Dancy's high school.

Williams testified that, once he arrived on the scene, he directed Dancy towards the patrol car and told him to place his hands on the car. He was

directly behind Dancy, who was facing the car. His attention was temporarily diverted to the confrontation between Elting and McGinley nearby. He testified that, at that point, he turned back to Dancy, "pressed [his] body weight into the lower part of Mr. Dancy's body," and "bent Mr. Dancy over at his waist at about approximately a 45 degree angle . . . to get him in a position of disadvantage." J. App. 913-14. Williams further testified that: "It wasn't a push. It was a move. It was a guiding movement with my hand and forearm." J. App. 914. He confirmed that he applied force to the upper part of Dancy's "back or neck" with his "forearm and hand," and that the action was "deliberate[]." J. App. 914, 920. Williams clarified that it may have been the "upper back, middle back area." J. App. 923. He testified that at no point did he observe Dancy's head or face actually make contact with the hood of the patrol car. He also confirmed that Dancy was cooperative and did nothing threatening or to attempt to flee.

Dancy testified that Williams arrived on the scene and walked him towards the patrol car. He watched as Elting was dragged to the ground by McGinley and beaten by McGinley and other officers who had appeared. Seeing this, he stated "this [is] wrong" and "we didn't do anything wrong." J. App. 865. After saying that, he "felt [his] face slam into the car" and felt a ringing in his left

-14-

ear. J. App. 865. He felt that he was pushed from behind, and testified that Williams was standing behind him.

Dancy was taken to the police station, interrogated, held overnight, arraigned, and detained at Dutchess County Jail until his mother bonded him out around 7:30 or 8:00 p.m. the following day. The following morning, he was taken to the hospital by his mother. Medical records confirm that Dancy was diagnosed with a fractured jaw at St. Francis Hospital. From there, he was sent to Westchester Medical Center via ambulance for surgery. His jaw was wired shut for approximately six weeks. During that time he was on a liquid diet and had difficulty speaking and sleeping.

## II.  *Procedural History*

Elting and Dancy sued Officers McGinley and Williams under 42 U.S.C. § 1983 asserting claims of false arrest and excessive force in violation of the Fourth Amendment.[5]

### A.  *The First Trial*

A joint trial was held before Magistrate Judge Lisa Margaret Smith.[6] At the close of evidence, Elting moved for judgment as a matter of law on his

---

[5]  Elting also asserted a malicious prosecution claim, which was discontinued pursuant to stipulation prior to trial.

false arrest claim, arguing that McGinley lacked even arguable probable cause for an arrest for obstruction of governmental administration.[7] After hearing argument, the district court ruled that it would enter judgment as a matter of law in favor of Elting for his false arrest claim, finding no facts from which a rational juror could conclude that McGinley had reasonable suspicion to stop him or probable cause to arrest him. In light of that ruling, it also ruled that it would enter judgment in favor of Elting on the excessive force claim on the basis that whatever force was used during an unauthorized arrest must have been excessive, putting to the jury only the questions of proximate cause and damages.[8] The court concluded that because these rights were clearly established as of October 2009, McGinley was not entitled to qualified immunity. The jury found that McGinley's actions were the cause of Elting's injuries and

---

[6]    Pursuant to 28 U.S.C. § 636(c), the parties consented to trial of the claims before Magistrate Judge Smith.

[7]    Dancy also moved for a judgment as a matter of law on his false arrest claim on the ground that the victim's identification of him as the assailant at the time of the stop was insufficient to support probable cause for his arrest. The court denied that motion, concluding that there were issues of fact as to whether he was subjected to false arrest.

[8]    The district court reasoned that because Elting prevailed on his false arrest claim, he necessarily prevailed on his excessive force claim as well. McGinley does not challenge that ruling. *But see Zellner v. Summerlin*, 494 F.3d 344, 378 (2d Cir. 2007) (suggesting absence of precedent for proposition that use of force is necessarily

-16-

awarded $115,000 for the false arrest and $100,000 for the use of excessive force. The jury awarded no punitive damages. Judgment was entered against McGinley on December 11, 2014.

With respect to Dancy's claims against Williams, the jury found that Williams had probable cause to arrest Dancy, but could not reach a verdict on the question of whether excessive force was used.

### B.    *The Second Trial*

A second trial was held on Dancy's claim against Williams for the use of excessive force. Prior to the retrial and again during the charging conference, Dancy objected to the district court's proposed jury instruction that required the jury to find that Williams acted intentionally or recklessly in performing the acts alleged. The court overruled the objection.

The jury found in favor of Williams, and judgment was entered in his favor.

### C.    *Post-trial motions*

McGinley moved under Rule 59 for remittitur or new trial on damages, arguing that the damages awards were excessive. The district court ruled that it would grant the motion for new trial on damages unless Elting

---

excessive when there is no probable cause to arrest); *Jones v. Parmley*, 465 F.3d 46, 62 (2d Cir. 2006).

stipulated to reduction to $81,500 on the excessive force claim, and denied the motion with respect to the damages for false arrest. Elting accepted the reduced damages award.[9]

Dancy moved for a new trial under Rule 59 on the ground that the jury instructions erroneously implied that he was required to prove that Williams acted intentionally in breaking his jaw. The district court denied the motion.

## D. *Issues on Appeal*

McGinley appeals 1) the entry of judgment entered against him as a matter of law on the question of liability, and 2) the denial in part of his Rule 59 motion for remittitur or a new trial, on the ground that the damages awards, even as remitted, were excessive.

Dancy appeals the denial of his Rule 59 motion for a new trial, arguing that the district court gave an improper jury instruction.

---

[9]    The district court did not enter a separate or amended judgment to reflect the reduced amount. Assuming a separate judgment was required, *see* Fed. R. Civ. P. 58(a), a judgment is deemed to have been entered 150 days after the May 11, 2015 order granting in part McGinley's Rule 59 motion, *see* Fed. R. Civ. P. 58(c)(2)(B); Fed. R. App. P. 4(a)(7)(A)(ii).

-18-

## DISCUSSION

We consider first Elting's false arrest claim against McGinley, and second Dancy's excessive force claim against Williams.

### I.     *Elting's Claim Against McGinley*

We address both liability and damages with respect to Elting's claims against McGinley.

#### A.     *Liability*

It is undisputed that Elting was in the presence of someone who "somewhat" matched the description of a robbery suspect near the scene of a crime, and that he looked over his shoulder at the police vehicle and refused orders to put his cell phone away. At issue is whether that information is even arguably sufficient for an investigatory stop and arrest for obstruction of governmental administration.

The district court concluded that, viewing the facts in the light most favorable to McGinley, no reasonable juror could conclude that he had reasonable suspicion to stop or probable cause to arrest Elting. It ruled that the law was clearly established at the time of the violations such that McGinley was not entitled to qualified immunity. We review *de novo* the district court's denial of qualified immunity, *see Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007), as well as

its ruling on a Rule 50(a) motion for judgment as a matter of law, which may be entered against a party "only if 'a reasonable jury would not have a legally sufficient basis to find for a party on that issue,'" *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011) (alteration omitted) (quoting Fed. R. Civ. P. 50(a)).

### 1.    *Applicable Law*

The Fourth Amendment guarantees citizens the "right . . . to be secure in their persons . . . against unreasonable . . . seizures."  U.S. Const. amend. IV.  Its touchstone of reasonableness imposes limits on the Government's seizure powers to "prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals."  *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976).  Section 1983 provides a cause of action for citizens to vindicate their Fourth Amendment rights.  *See Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006).

Police officers are shielded from suit under § 1983 so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *accord Zellner*, 494 F.3d at 367.  "'A right is clearly established' when 'the contours of the right

-20-

are sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011) (alterations omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Moreover, if "'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context," the officer is entitled to qualified immunity. *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). But, if "it is obvious that no reasonably competent officer" would have taken such action, that officer will not be immune. *Malley*, 475 U.S. at 341. In other words, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley*, 475 U.S. at 341).

a.  ***Investigatory Stops***

In *Terry v. Ohio*, the Supreme Court recognized that police officers may in "appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 22 (1968). To justify a *Terry* stop, the officer must have reasonable suspicion -- "a reasonable basis to think that the person to be detained 'is committing or has committed a

-21-

criminal offense.'" *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (quoting

*Arizona v. Johnson*, 555 U.S. 323, 326 (2009)).

Reasonable suspicion requires more than an "inchoate suspicion or

mere hunch." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (quoting

*United States v. Glover*, 957 F.2d 1004, 1010 (2d Cir. 1992)).  It "demands 'specific

and articulable facts which, taken together with rational inferences from those

facts,' provide detaining officers with a 'particularized and objective basis for

suspecting legal wrongdoing.'" *United States v. Singletary*, 798 F.3d 55, 59 (2d Cir.

2015) (citation omitted) (first quoting *Terry*, 392 U.S. at 21, and then quoting

*United States v. Arvizu*, 534 U.S. 266, 273 (2002)).  This standard is "not high";

rather, it requires "only facts sufficient to give rise to a reasonable suspicion that

criminal activity 'may be afoot.'" *Bailey*, 743 F.3d at 332 (quoting *Terry*, 392 U.S. at

30).

In assessing reasonable suspicion determinations, we take into

account the "totality of the circumstances supporting the investigatory stop,"

*United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2006), and "evaluate those

circumstances 'through the eyes of a reasonable and cautious police officer on the

scene, guided by his experience and training,'" *Bayless*, 201 F.3d at 133 (quoting

*United States v. Oates*, 560 F.2d 45, 61 (2d Cir. 1977)).  "An indication of possible

illicit activity is properly informed by 'commonsense judgments and inferences about human behavior.'" *Singletary*, 798 F.3d at 60 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)); *accord United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008). "[C]onduct that is 'as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity." *Padilla*, 548 F.3d at 187 (quoting *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991)).

A valid *Terry* stop must also be "justified at its inception, and . . . reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990) (quoting *Terry*, 392 U.S. at 20). To support an accompanying frisk for weapons, the officer must also have "reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Johnson*, 555 U.S. at 327; *accord Adams v. Williams*, 407 U.S. 143, 146 (1972) ("The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . .").

### b. *False Arrest*

"In analyzing § 1983 claims for unconstitutional false arrest, we have generally looked to the law of the state in which the arrest occurred." *Jaegly*, 439

F.3d at 151 (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)). Under New York law, a false arrest claim requires a plaintiff to show that "the defendant intentionally confined him without his consent and without justification." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012). "[T]he existence of probable cause" for an arrest "is an absolute defense to a false arrest claim." *Jaegly*, 439 F.3d at 152. Probable cause exists "when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (quoting *Weyant*, 101 F.3d at 852). Therefore, "[w]hether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979).

Qualified immunity protects an officer so long as he had "arguable probable cause" to arrest, which "exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)). An officer is not entitled to qualified

immunity if "no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995). "Arguable probable cause should not be misunderstood to mean almost probable cause." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (quotation marks omitted). "If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Id.*

### 2. *Application*

We agree with the district court's determination that on the evidence adduced at trial, McGinley was not entitled to qualified immunity as a matter of law.[10] First, no reasonable officer could have believed that there was reasonable suspicion to stop Elting under the circumstances. Second, no reasonable officer could have believed that there was probable cause to arrest Elting for obstruction of governmental administration on the facts presented.

---

[10] Contrary to Elting's assertion, McGinley's qualified immunity argument is not waived. He raised the issue in opposing Elting's Rule 50 motion, in his answer to the complaint, and in his motion for summary judgment.

-25-

### a. *McGinley Lacked Reasonable Suspicion to Stop Elting*

We must determine first when Elting was stopped, and hence "seized" for purposes of the Fourth Amendment, and second whether reasonable suspicion existed at that point. *See United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013).

Prior to McGinley ordering Elting to put his cell phone away, their interaction could arguably be characterized as a voluntary encounter for which no reasonable suspicion was necessary.[11] *See United States v. Drayton*, 536 U.S. 194, 202 (2002). McGinley concedes, and we agree, that the stop occurred at the very latest when McGinley instructed Elting not to use his phone.[12] By that

---

[11]  McGinley testified somewhat inconsistently on this point, stating that, upon his approach, he both "asked them if [he] could talk to them for a minute," J. App. 282, and that he "asked them to stop," J. App. 283. There is no dispute that they did in fact stop walking in response to whatever was said. Had he in fact ordered them to stop, these circumstances might have been sufficient to constitute a seizure. *See United States v. Simmons*, 560 F.3d 98, 105-06 (2d Cir. 2009) ("A police officer's order to stop constitutes a seizure if 'a reasonable person would have believed that he was not free to leave,' . . . and the person complies with the officer's order to stop." (first quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), and then citing *United States v. Swindle*, 407 F.3d 562, 572 (2d Cir. 2005))).

[12]  The same result would obtain if the seizure did not begin until McGinley physically touched Elting's back with the intention of frisking him and took him to the ground. If their interaction was purely voluntary prior to that point, Elting was free to disregard McGinley's cell phone order and that refusal could not be considered suspicious. *See Muhammad*, 463 F.3d at 123 ("An individual approached by an officer who has no reasonable suspicion of wrongdoing may ignore the officer and go about his business, and his refusal to cooperate may not form the basis for his detention."). Therefore, the gap in time between the cell phone order and the application of physical

-26-

point, McGinley had followed Dancy and Elting for a block and a half in his marked police vehicle, exited the car, asked to speak to them, and informed them that Dancy fit the description of a suspect. They complied with his request. McGinley then told Elting "numerous times" not to use his phone. J. App. 299. McGinley testified that, when he gave the cell phone orders, he was within two feet of Elting, his demeanor had changed, and he used a loud, commanding voice, while employing an expletive. In light of all the circumstances, any reasonable person in Elting's situation "would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (noting that relevant factors signaling a police seizure include "the use of language or tone of voice indicating that compliance with the officer's request might be compelled").

Because a stop must be justified "at its inception," we consider only the facts known to McGinley that prompted him to give the cell phone orders. *Terry*, 392 U.S. at 20; *see Simmons*, 560 F.3d at 105. The facts McGinley offers to establish reasonable suspicion prior to the stop are: 1) Elting's presence in the company of an individual who (in some ways) met the description of a robbery suspect; 2) the proximity in time and space to the crime; and 3) Elting and Dancy looking over their shoulders at the police car following them.

force contributes no additional facts on which McGinley could base his reasonable suspicion determination. *See Freeman*, 735 F.3d at 102.

First, mere presence near someone who somewhat matches a vague description is not a reasonable basis for suspicion. The radio dispatch, as described in the narrative report, and the officer who interviewed the suspect and provided the description over the radio, described only a thin, black male wearing a brown jacket traveling in an unknown direction. McGinley observed Elting in the company of Dancy, who "somewhat" matched the description broadcast over the radio. J. App. 280. Dancy was indeed thin, black, and male. But, unlike the description, he was wearing a camouflage-patterned coat. While such a discrepancy does not necessarily defeat a finding of reasonable suspicion, *see United States v. Jackson*, 652 F.2d 244, 248-49 (2d Cir. 1981); *see also United States v. Abdus-Price*, 518 F.3d 926, 930 (D.C. Cir. 2008), the remaining description -- thin, black, and male -- is too vague in the circumstances here to justify a stop of anyone meeting it, *see Swindle*, 407 F.3d at 569-70 ("[R]ace, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop."); *Brown v. City of Oneonta*, 221 F.3d 329, 334 (2d Cir. 2000) ("[A] description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure."). Furthermore, the description did not mention a second assailant or accomplice, and Elting's mere presence in the company of a possible suspect is, standing alone, not enough for

a stop.  *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).  Hence, the description of a "thin black male, brown jacket" was hardly a basis for stopping these two teenagers.

Second, while they were found walking within several city blocks of the crime scene, such proximity was innocuous given the unremarkable nature of the area in question.  *Cf. United States v. McCargo*, 464 F.3d 192, 197 (2d Cir. 2006). Dancy and Elting were first seen walking west on Main Street, about a block away from the crime scene, some minutes after the radio broadcast.[13]  It would not have been unusual to find a thin, black male in downtown Poughkeepsie that Friday evening.  The city itself is 33.5% African-American.[14]  Poughkeepsie's Main Street is aptly named, featuring a number of restaurants, businesses, and nightlife.[15]  Under the circumstances, the description fit too many people to constitute sufficient articulable facts on which to justify a forcible stop of Elting.

---

[13]     It is unclear exactly how long after the radio broadcast they were seen. The broadcast went out at 11:02:46 pm, which was some minutes after the actual attempted robbery.  McGinley reported that he stopped them at 134 Cannon three minutes later, at 11:05:54 pm, after following them for more than a block and a half.

[14]     *See* U.S. Census Bureau, QuickFacts, Poughkeepsie City, New York, http://www.census.gov/quickfacts/table/RHI225215/3659641,00 (last visited Dec. 6, 2016).  Officer Craig testified that approximately half of Poughkeepsie is African American, and that there are many thin, black men residing there.

[15] *See* Google Maps, https://www.google.com/maps/place/472+Main+St,+Poughke epsie,+NY+12601 (last visited Dec. 6, 2016).  A Google Maps printout of poor quality was entered into the record.

*See Goodson v. City of Corpus Christi*, 202 F.3d 730, 737 (5th Cir. 2000) (holding that because plaintiff matched description "tall, heavy-set, white man dressed as a cowboy" only insofar as plaintiff was a "tall, heavy-set, white man," the description was "too vague, and fit too many people," to justify a *Terry* stop).

Third, as the case law recognizes, in the circumstances here there is nothing suspicious about looking over one's shoulder at an approaching police car. McGinley testified that his suspicions were aroused by the fact that Dancy and Elting looked over their shoulders "numerous times" at his patrol car, as he slowly followed them for about a block and a half. J. App. 301. In the circumstances here, looking over one's shoulder at an officer in slow pursuit is not suspicious behavior. *See United States v. Keith*, 559 F.3d 499, 505 (6th Cir. 2009) ("[I]t is entirely to be expected that, out of curiosity, [the suspect's] attention was drawn to the nearby police cars with flashing lights at that time of the night."); *United States v. Montgomery*, 561 F.2d 875, 879 (D.C. Cir. 1977) ("Drivers simply do take notice when the police are nearby, and a person circling a block for whatever reason would take notice of a police car following him."); *United States v. Parker*, No. 99-CR-123 (JG), 1999 WL 997282, at *6 (E.D.N.Y. Oct. 18, 1999) ("That [the defendant] turned back to look at the officers approximately three times does not constitute suspicious behavior." (footnote omitted)). Indeed, it is

natural for people to take an interest in police activity nearby "out of a desire to avoid some minor misstep, such as a minor traffic violation, which would involve them unnecessarily with the police." 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.5(g) (5th ed. 2016). Any innocent pedestrian, upon realizing that he is being slowly followed by a police vehicle for some minutes, would look over his shoulder at the officer following him. Calling that behavior suspicious is not consistent with "commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125; *see United States v. Jones*, 149 F.3d 364, 370 (5th Cir. 1998) ("[W]hen the officer's actions are such that any [individual], whether innocent or guilty, would be preoccupied with his presence, then any inference that might be drawn from the [individual's] behavior is destroyed.").

Nor did Dancy or Elting exhibit nervous or evasive behavior of any kind. *Cf. Florida v. Royer*, 460 U.S. 491, 493 n.2 (1983); *Wardlow*, 528 U.S. at 124. Officer McGinley did not suggest that they appeared nervous, attempted to conceal anything, changed direction, ran away, quickened their pace, or made furtive gestures. *Cf. Jackson*, 652 F.2d at 248-49.

Considering these facts together and under the "totality of the circumstances," *Arvizu*, 534 U.S. at 273, we conclude that McGinley had no basis

to suspect Elting of any legal wrongdoing, *see Swindle*, 407 F.3d at 570 (concluding with "no difficulty" that officers lacked reasonable suspicion to stop individual who met "black male" description in area of expected criminal activity but who exhibited no unusual behavior). Elting was walking with a thin, black male in downtown Poughkeepsie on a Friday evening, in proximity of a crime scene, nothing more. There was nothing suspicious about his actions. On these facts, no reasonable police officer would have had reason to stop him, or prevent him from calling his mother, or throw him to the ground.[16]

Because subjective intentions are irrelevant to this analysis, *see Whren v. United States*, 517 U.S. 806, 813 (1996), we do not assess what was motivating this police officer when he decided to stop Elting. But we do know that, objectively speaking, he lacked reasonable suspicion, and so violated the Fourth Amendment by detaining Elting without an adequate basis. As a result of this suspicionless stop, an African-American teenager was arrested, jailed, and subjected to "the humiliations of [an] unconstitutional search[]." *Utah v. Strieff*, 136 S. Ct. 2056, 2070 (2016) (Sotomayor, *J.*, dissenting). Circumstances like these

---

[16] To the extent McGinley argues that he had reasonable suspicion to believe that Elting was armed and dangerous to perform a frisk, he has even less ground to stand on. A cell phone is not a weapon. The crime itself did not involve a weapon and nothing about Elting's behavior suggested that he had a weapon on his person. *Cf. Muhammad*, 463 F.3d at 123-24.

remind us that specificity in articulating the basis for a stop is necessary "in part because according the police unfettered discretion to stop and frisk could lead to harassment of minority groups and 'severely exacerbate police-community tensions.'" *Bayless*, 201 F.3d at 133 (alterations omitted) (quoting *Terry*, 392 U.S. at 14 n.11).

In sum, viewing the evidence in the light most favorable to McGinley, and even assuming that he stopped Elting for his stated reasons, we conclude as a matter of law that he lacked reasonable suspicion, based on specific and articulable facts, to stop Elting. The district court properly granted judgment as a matter of law in Elting's favor.

**b.** *McGinley Lacked Probable Cause to Arrest Elting for Obstructing Governmental Administration*

McGinley argues that he had arguable probable cause to arrest Elting for obstruction of governmental administration based on his refusal to cooperate with the stop, his noncompliance with the cell phone order, and his asserted attempt to flee. None of these facts supports a finding of probable cause, and no reasonable officer would have arrested Elting in the circumstances presented.

A cause of action for false arrest "accrues at the time of detention." *Jaegly*, 439 F.3d at 154. "We turn to the elements of the offense for which [the

-33-

plaintiff] was arrested -- obstructing governmental administration -- to assess the objective reasonableness of the officers' belief that probable cause existed to arrest the plaintiff." *Lennon*, 66 F.3d at 424.  Section 195.05 of the New York Penal Law defines the offense of obstructing governmental administration:

> A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act . . . .

The crime requires one of the following: "(1) 'intimidation,' (2) 'physical force or interference,' or (3) 'any independently unlawful act.'"  *Uzoukwu v. City of New York*, 805 F.3d 409, 414 (2d Cir. 2015) (quoting *People v. Case*, 42 N.Y.2d 98, 101-02 (1977)).  Any interference must be physical, *id.*, and must obstruct an "official function . . . 'authorized by law,'" *Lennon*, 66 F.3d at 424 (quoting *In re Verna C.*, 531 N.Y.S.2d 344, 345 (2d Dep't 1988)); *accord Cameron v. City of New York*, 598 F.3d 50, 68 (2d Cir. 2010).

McGinley lacked probable cause to arrest Elting here.  First, Elting's attempts to use his cell phone did not, in context, suggest that he was trying to obstruct -- or that he did obstruct -- McGinley's investigation.  While, in another case, repeatedly reaching for a phone may indicate an attempt to interfere, *cf. In*

-34-

*re Davan L.*, 91 N.Y.2d 88, 90-91 (1997) (holding that interference element was met where individual intentionally interceded in police sting operation, and yelled warnings of police presence to others, causing physical reaction and dispersal), here Elting plausibly indicated that he only wished to contact his mother, and McGinley was at no risk of harm from the phone being thrown at him, and no other circumstances -- including the "two steps" that Elting took away from McGinley, J. App. 373 -- implied that Elting hoped to obstruct McGinley.

Moreover, even if the stop were lawful, Elting's refusal to respond was protected under the state constitution, in the circumstances here. *See People v. Howard*, 50 N.Y.2d 583, 590 (1980). In New York, unless he is otherwise lawfully detained, "[a]n individual to whom a police officer addresses a question has a constitutional right not to respond. He may remain silent or walk or run away. His refusal to answer is not a crime." *Uzoukwu*, 805 F.3d at 415-16 (quoting *People v. Howard*, 50 N.Y.2d 583, 586 (1980)); *see also People v. Ferreira*, 807 N.Y.S.2d 832, 834 (Crim. Ct. 2005). "[T]he failure to stop or co-operate by identifying oneself or answering questions [cannot] be the predicate for an arrest absent other circumstances constituting probable cause." *Howard*, 50 N.Y.2d at 591-92; *see also People v. Grullon*, No. 2005NY044001, 2005 WL 2738354, at *3 (Crim. Ct. Oct. 24, 2005) ("[C]ase law establishes that a citizen's act of leaving, or

-35-

even running from, the police does not violate [§ 195.05].").  Thus, while the police may be entitled to make a request, individuals have a right not to respond in the absence of reasonable suspicion or probable cause.

Second, Elting's actions could not have constituted obstruction of governmental administration because McGinley's *Terry* stop and frisk were unauthorized.  *See supra*; *People v. Lupinacci*, 595 N.Y.S.2d 76, 77 (2d Dep't 1993) (concluding that because stop was unlawful, defendant's actions in avoiding handcuffing and walking away from the arresting officer did not create probable cause to justify arrest for obstruction of governmental administration); *see also Jackson v. City of New York*, 939 F. Supp. 2d 219, 230 (E.D.N.Y. 2013) (concluding that because plaintiff's vehicle was unlawfully stopped, her failure to comply with an unjustified order to exit her vehicle does not create probable cause to justify arrest for obstruction of governmental administration).  Elting's noncompliance with McGinley's orders could not furnish McGinley with probable cause to arrest.  *See Muhammad*, 463 F.3d at 123 ("An individual approached by an officer who has no reasonable suspicion of wrongdoing may ignore the officer and go about his business, and his refusal to cooperate may not form the basis for his detention."); *Esmont v. City of New York*, 371 F. Supp. 2d 202, 210 (E.D.N.Y. 2005) (citing New York cases and concluding that "[r]esisting an

illegal search does not . . . constitute a violation of the statute").  Therefore, no reasonable officer would have believed that he could stop Elting or lawfully order him to put his phone away such that Elting's noncompliance would amount to probable cause for the crime of obstructing governmental administration.[17]

**B.**    *Remittitur*

McGinley argues that the jury's $115,000 false arrest award and the $81,500 excessive force award as remitted shock the conscience.  Neither award shocks the conscience.  Accordingly, we hold that the district court did not abuse its discretion in making its remittitur determinations.

**1.**    *Applicable Law*

"The 'calculation of damages is the province of the jury,' . . . and 'we will not vacate or reduce a jury award merely because we would have granted a lesser amount of damages.'"  *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014) (first quoting *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990), and then

---

[17]    Because there was no arguable probable cause to arrest Elting for obstruction of governmental administration, there was also no probable cause to arrest for *resisting* that arrest.  *See Curry v. City of Syracuse*, 316 F.3d 324, 336 (2d Cir. 2003) ("It is well established in New York that 'probable cause to arrest is a prerequisite for making an authorized arrest,' and if there is no probable cause to arrest a person, that person 'cannot be guilty of resisting arrest.'" (quoting *People v. Mohamadou*, 698 N.Y.S.2d 445, 447-48 (Crim. Ct. 1999)).

quoting *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012)). The district

court's role is limited to determining "whether the award is so high as to shock

the judicial conscience and constitute a denial of justice." *DiSorbo v. Hoy*, 343 F.3d

172, 183 (2d Cir. 2003) (quoting *Mathie v. Fries*, 121 F.3d 808, 813 (2d Cir. 1997)).

We, in turn, conduct a "narrow" review of the district court's decision on a

motion for remittitur or a new trial for abuse of discretion. *Id.*; *Turley*, 774 F.3d at

162. "If the question of excessiveness is close or in balance, we must affirm. . . .

We must give the benefit of every doubt to the judgment of the trial judge; but

surely there must be an upper limit, and whether that has been surpassed is not a

question of fact with respect to which men may differ, but a question of law."

*Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (alteration in

original) (quoting *Payne v. Jones*, 711 F.3d 85, 98 (2d Cir. 2012)).

In determining whether a compensatory damage award is excessive, we consider

"amounts awarded in other, comparable cases." *DiSorbo*, 343 F.3d at 183 (quoting

*Mathie*, 121 F.3d at 813); *see also Ismail*, 899 F.2d at 186. Nevertheless, we examine

each case individually as a unique set of facts and circumstances. *Scala v. Moore*

*McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1993). Thus, while a review of

comparable cases is appropriate, "we need not average the high and low awards;

we focus instead on whether the verdict lies 'within [the] reasonable range.'"

*Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 (2d Cir. 2012) (alteration in original) (quoting *Ismail*, 899 F.2d at 187).

### 2. *Application*

The district court addressed Elting's excessive force and false arrest injuries separately, attributing his physical injuries to the excessive force and his emotional injuries to his false arrest, to avoid double recovery for the same injuries. *See Bender v. City of New York*, 78 F.3d 787, 793 (2d Cir. 1996). [18]

### a. *Excessive Force*

The $81,500 award as remitted for Elting's injuries caused by McGinley's excessive use of force during the arrest does not shock the conscience. As detailed above, the evidence at trial demonstrated that Elting -- a 17 year-old high school student -- was inexcusably beaten by police officers. As a result he suffered bruising and abrasions to his head, face, and torso. He

---

[18] Though some percentage of Elting's emotional injuries may be attributed to the excessive force as distinct from the false arrest, the district court addressed them only in context of false arrest, noting that Elting himself only discussed emotional damages as to his false arrest claim. The jury was instructed, however, not to award compensatory damages more than once for the same injury and to consider "pain and suffering and emotional or mental anguish experienced . . . on each . . . claim[]." J. App. 659. We therefore take into account any non-duplicative emotional pain associated with the excessive force in conducting our review of the excessive force award. *See Martinez v. Port Auth. of N.Y. & N.J.*, 445 F.3d 158, 161 (2d Cir. 2006).

continued to experience soreness, swelling, and headaches for a couple of weeks thereafter, and missed a week of school as a result.

The award of $81,500 is within the permissible range of compensatory damages awards we have approved in other excessive force cases. *See DiSorbo*, 343 F.3d at 176, 181 (reducing a jury award of $400,000 to $250,000 where the plaintiff was choked, slammed against a wall, thrown to the ground, struck while defenseless on the floor, and dragged through the police station by officers, but suffered no permanent injuries); *Blisset v. Coughlin,* 66 F.3d 531, 533-34, 536 (2d Cir. 1995) (affirming $75,000 compensatory damages award to inmate who was assaulted while handcuffed by corrections officers; he was punched, struck repeatedly with batons, kicked, and choked until he fell briefly unconscious).

It is also in line with what district courts within this circuit have awarded for similar injuries. *See Lewis v. City of Albany Police Dep't*, 547 F. Supp. 2d 191, 206-10 (N.D.N.Y. 2008) (concluding that $65,000 damages award did not shock conscience where plaintiff experienced contusions, swelling, and headaches due to officer standing on his head and grinding his face into pavement); *Hightower v. Nassau Cty. Sheriff's Dep't*, 325 F. Supp. 2d 199, 207-09 (E.D.N.Y.) (reducing $150,000 award to $65,000 where two altercations with

guards left pretrial detainee with bruises and contusions, swollen upper lip, and pain in the lumbar spine, without rendering permanent damage), *vacated in part on other grounds by* 343 F. Supp. 2d 191 (E.D.N.Y. 2004); *Morales v. City of New York*, No. 99 Civ. 10004 (DLC), 2001 WL 8594, at \*7, 10 (S.D.N.Y. Jan. 2, 2001) (reducing jury award of $2.75 million to $50,000 for "deep bruises" and months of counseling caused by altercation with police during which officer held plaintiff tightly by upper arms and forced her into police car).

Though there were no permanent physical injuries, the nature and circumstances of the inflicted force justify the award. Therefore, we conclude that the award is not unreasonable.

### b.    *False Arrest*

Under New York law, false arrest damages are awarded "only for the period from initial custody until arraignment." *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992). "The plaintiff is entitled to compensation for loss of time, for physical discomfort or inconvenience, and for any resulting physical illness or injury to health. Since the injury is in large part a mental one, the plaintiff is entitled to damages for mental suffering, humiliation, and the like." *Jaegly*, 439 F.3d at 154 (quoting W. Keeton et al., *Prosser and Keeton on the Law of Torts* § 11, at 48 (5th ed. 1984)).

First, we reject McGinley's argument that there was insufficient evidence in the record to support the jury's damage award with respect to Elting's emotional injuries. The "objective circumstances of the violation itself" substantiate Elting's testimony about his emotional injuries, as does his mother's corroborating testimony. *Patrolmen's Benevolent Ass'n v. City of New York*, 310 F.3d 43, 55 (2d Cir. 2002).

Second, the award of $115,000 is not excessive. *See Gardner v. Federated Dep't Stores, Inc.*, 907 F.2d 1348, 1350, 1353 (2d Cir. 1990) (remitting award of damages for deprivation of liberty and pain and suffering from $300,000 to $200,000 where plaintiff was falsely arrested and accused of theft by security guards in a store, handed over to police, and imprisoned for another six hours). In *Martinez v. Port Authority of New York & New Jersey*, we affirmed an award of $360,000 for a false arrest claim, consisting of $200,000 for emotional distress and $160,000 for loss of liberty. 445 F.3d 158, 159-61 (2d Cir. 2006) (per curiam). There, the plaintiff was arrested outside a men's bathroom for public lewdness, subjected to humiliation as a result of the arrest, and detained for approximately nineteen hours. *See Martinez v. Port Auth. of N.Y. & N.J.*, No. 01 Civ. 721 (PKC), 2005 WL 2143333, at *1, 17 (S.D.N.Y. Sept. 2, 2005). After his

release, the plaintiff experienced sleeplessness, loss of appetite, and anxiety, and briefly contemplated suicide. *Id.* at \*18.

Elting's emotional damages as a result of the experience were substantial. His age is of particular significance, as there can be little doubt that an event such as he experienced here has a deeper and lasting impact on a seventeen-year old than an adult. *See Zeno*, 702 F.3d at 672 (finding fact that plaintiff was teenager -- "a vulnerable point in his life" -- relevant to gravity of his emotional injuries). He was subjected to the demeaning process of being arrested, booked at the police station, fingerprinted, interrogated by two detectives about a robbery, and detained overnight in a cell. The jury could have reasonably found that the event left an indelible impression on him and his attitudes toward police officers. Elting testified that the incident "changed [his] outlook on a lot of things." J. App. 148. He lost trust in the police and his mother's coworkers at the Duchess County Correctional Facility, elaborating as follows:

> Q: Why do you say you didn't trust the police after this?
>
> A: Because we were doing nothing wrong and we were assaulted. Like I heard about it, but I got to witness it firsthand because my mother always told me that most of the time when people are in

situations with the police, it's because they put themselves there. We didn't do that.

J. App. 148. *Cf. Strieff*, 136 S. Ct. at 2070 (Sotomayor, J., dissenting) ("For generations, black and brown parents have given their children 'the talk' -- instructing them never to run down the street; always keep your hands where they can be seen; do not even think of talking back to a stranger -- all out of fear of how an officer with a gun will react to them."). Thus, damages in the amount of $115,000 for such injuries was not excessive.

## II.    *Dancy's Claims Against Williams*

Williams testified that he deliberately bent Dancy over the police car, but claimed that he did not cause Dancy's injuries and that he never intended Dancy any harm. He denies that Dancy's face ever came into contact with the hood. Dancy argued that Williams's use of force was certainly intentional at the outset and that thereafter, whether Williams intended to hurt him or not, the force used was objectively unreasonable, resulting in his broken jaw.

The district court instructed the jury that, to impose liability, it was required to find that Williams "acted intentionally or recklessly" rather than "merely negligent[ly]" in performing the acts alleged, and it suggested that if

Williams's actions were "merely negligent," Dancy could not recover even if his injuries resulted from that negligence. J. App. 1009. We conclude that there was a lack of clarity in the court's instructions that improperly placed the burden on Dancy to prove intent, not only as to the seizure but as to the injury as well. The error was not harmless.

**A.** *Applicable Law*

"[W]e review challenges to jury instructions in civil cases *de novo*, 'and will grant a new trial if the error is not harmless.'" *Rasanen v. Doe*, 723 F.3d 325, 331-32 (2d Cir. 2013) (quoting *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 758 (2d Cir. 2004)). "A jury charge is erroneous if it misleads the jury as to the correct legal standard, or if it does not adequately inform the jury of the law." *Hathaway v. Coughlin*, 99 F.3d 550, 552 (2d Cir. 1996). It "will be deemed adequate if 'the charge, taken as a whole, is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it.'" *Id.* at 553 (quoting *Schermerhorn v. Local 100, Transp. Workers Union of Am.*, 91 F.3d 316, 322 (2d Cir. 1996)). The error must be sufficiently serious to undermine "the very integrity of the trial." *SCS Commc'ns Inc. v. Herrick Co.*, 360 F.3d 329, 343 (2d Cir. 2004) (quoting *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 61 (2d Cir. 2002)).

The Fourth Amendment protects individuals from seizures executed with excessive force. *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989). Whether the force used was excessive is analyzed under the Fourth Amendment's "reasonableness" standard, and determined by "balancing . . . 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 395-96 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). It requires the consideration of the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*; *accord Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015).

Intent is a factor -- to a limited extent. A plaintiff must prove that an officer intended to commit acts that constituted a seizure in the first instance. The Fourth Amendment is not implicated absent a "governmental termination of freedom of movement *through means intentionally applied*." *Brower v. Cty. of Inyo*, 489 U.S. 593, 596-97 (1989) ("[That] the detention . . . be willful . . . . is implicit in the word 'seizure,' which can hardly be applied to an unknowing act."). But as long as an officer deliberately performed acts that constitute a seizure, the Fourth

Amendment has been triggered, regardless of whether it was accomplished by the exact method intended.

Intent is not relevant, however, as to the officer's underlying motivation for his actions during the course of a seizure. In *Graham*, the Supreme Court made clear that the standard is one of objective reasonableness, meaning the officer's "underlying intent or motivation" is not a factor. 490 U.S. at 397; *see Hudson*, 271 F.3d at 68 ("Section 1983 does not require any intent to violate constitutional rights."). An officer's good intentions are immaterial and will not justify an objectively unreasonable use of force. *See Graham*, 490 U.S. at 397; *Brown*, 798 F.3d at 100-01.

Thus, a plaintiff need not prove that the officer intended to violate his rights, *Hudson*, 271 F.3d at 68-69, or intended that a "certain result be achieved," *Fisher v. City of Memphis*, 234 F.3d 312, 317 (6th Cir. 2000). Objectively unreasonable actions during the course of a seizure, even if based on a mistake, are unconstitutional. *See Henry v. Purnell*, 652 F.3d 524, 532 (4th Cir. 2011) ("All actions, . . . mistaken or otherwise, are subject to an objective test."); *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) ("Not all errors in perception or judgment . . . are reasonable.").

"The seizure and reasonableness inquiries are distinct and should

not be conflated." *Carlson v. Bukovic*, 621 F.3d 610, 618 (7th Cir. 2010). Once a seizure has been set in motion by an intentional act, the Fourth Amendment's "reasonableness" standard applies to the manner in which the seizure is executed. This applies to all officer actions, "without regard to their underlying intent," and lasts at least until "the point at which the arrest ends and pretrial detention begins." *Graham*, 490 U.S. at 395 n.10, 397; *accord Powell v. Gardner*, 891 F.2d 1039, 1043-44 (2d Cir. 1989). Thus, once a seizure is initiated, an officer's objectively unreasonable conduct may violate the Fourth Amendment regardless of whether the officer intended any injury to result. *See Stamps v. Town of Framingham*, 813 F.3d 27, 37 (1st Cir. 2016) ("There is widespread agreement among the circuits that have addressed the issue that a claim is stated under the Fourth Amendment for objectively unreasonable conduct during the effectuation of a seizure that results in the unintentional discharge of an officer's firearm."); *Watson v. Bryant*, 532 F. App'x 453, 457-58 (5th Cir. 2013) (per curiam) ("An undisputedly accidental shooting . . . does not end the inquiry. [The officer] still may have violated the Fourth Amendment if he acted objectively unreasonably by deciding to make an arrest, by drawing his pistol, or by not reholstering it before attempting to handcuff [the plaintiff].").

Williams argues that, under Section 1983, a plaintiff "must establish

that the force used was purposeful or intentional, and not accidental," citing the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015).  Resp. & Reply Br. for Def.-Appellant & Def.-Appellee 17.  But *Kingsley* addressed only the legally requisite state of mind required for a pretrial detainee's excessive force claims under the Due Process Clause of the Fourteenth Amendment.  *See Kingsley*, 135 S. Ct. at 2472.  What mental state a § 1983 plaintiff is required to prove depends on the right at issue.  Section 1983 "does not itself import an intent standard into an underlying constitutional deprivation that lacks such a requirement."  *Hudson*, 271 F.3d at 68.   Plaintiffs "need only demonstrate intent where the underlying constitutional deprivation, such as an equal protection violation under the Fourteenth Amendment, calls for it."  *Id*.  Notably, unlike § 1983 claims under the Due Process Clause or Eighth Amendment, Fourth Amendment claims are tied to reasonableness, which is considerably less demanding.  *See Graham*, 490 U.S. at 398 ("Differing standards under the Fourth and Eighth Amendments are hardly surprising: the terms 'cruel' and 'punishments' clearly suggest some inquiry into subjective state of mind, whereas the term 'unreasonable' does not."); *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 848-49 (1998) (rejecting negligence standard in context of Due Process Clause because the Constitution "does not guarantee due care on the part of state

officials;" only "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level").

In *Hudson*, we "readily" "assum[ed]" that "*all* Fourth Amendment violations require intentional *actions* by officers, rather than 'the accidental effects of otherwise lawful government conduct.'" *Hudson*, 271 F.3d at 69 (first emphasis added) (quoting *Brower*, 489 U.S. at 596) (citing only *Brower* and *Medeiros v. O'Connell*, 150 F.3d 164 (2d Cir. 1998), and applying the concept to a government search); *see also Brower*, 489 U.S. at 596 ("Violation of the Fourth Amendment requires an intentional acquisition of physical control."). But in the excessive force context, the intent in question can only be the intent to perform some action, not that a particular result be achieved. So long as the plaintiff can point to unreasonable intentional action taken that proximately caused the injury after the seizure is initiated, no additional intent to injure is required.

**B.    *Application***

The jury was instructed that, to establish deprivation of a right secured by the Constitution, Dancy had to show:

> that in performing the acts alleged, the defendant acted intentionally or recklessly. . . .

> [T]o establish a claim under Section 1983, a plaintiff must . . . show that a defendant acted intentionally or recklessly. If you have found that the defendant committed the act in question, you must then determine whether the defendant acted intentionally or recklessly. If so, you will go on to consider the third element of the plaintiff's second 1983 claim.
>
> If, however, you find that the defendant's acts were merely negligent, then even if you find that the plaintiff was harmed as a result of those particular acts or omissions, you must find that the plaintiff has not established his claim under Section 1983. . . .
>
> An act is intentional if it is done knowingly; that is, if it is done voluntarily and deliberately and not because of mistake, accident, negligence or other innocent reason.
>
> An act is reckless if it is done in conscious disregard of its known probable consequences.
>
> An act is negligent if a person was under a duty or obligation recognized by law that required that person to adhere to a certain standard of conduct to protect others against unreasonable risks, and that person breached that duty or obligation.

J. App. 1006, 1009-10.

This instruction is confusing in the context of excessive force liability. Instructing that a plaintiff must show that "the defendant acted intentionally or recklessly" and that if "the defendant's acts were merely negligent . . . [the jury] must find that the plaintiff has not established his claim" could be understood to suggest incorrectly that an officer must have intended the *results* of his actions or consciously disregarded their *consequences*. The district

court's instruction thus may have led the jury to erroneously believe that it was required to find that Williams intended to hit Dancy's face against the car and/or to injure him.

Indeed, the district court appears to have operated under the same misconception. In denying Dancy's Rule 59 motion, it stated that "the jury could have found that . . . to the degree [Williams] actually used greater force than he intended, such greater force (sufficient to break Dancy's jaw) was the result of a negligent rather than an intentional act." J. App. 1098. Yet, even if Williams did not intend to use enough force to break Dancy's jaw, his actions may still have been objectively unreasonable because of the risk of injury, regardless of whether Williams was aware of the risk.

Further, to the extent Dancy was required to prove any intent at all, it was satisfied by Williams's admission that he applied some degree of force and did so deliberately. It was that force that Dancy claims was both objectively unreasonable and caused his injuries. The jury could find either that the injury did not actually occur as a result of the force Williams applied, meaning that Williams did not proximately cause Dancy's injury, *or* that the amount of force used was reasonable. What it could *not* do was conclude that Williams

intentionally used force, but was not liable because he did not intend that the force result in the injury Dancy suffered.

The fact that the district court explained the objective reasonableness standard elsewhere in the instruction does not cure the error. *See Hudson*, 271 F.3d 62, 69-70 (2d Cir. 2001) (error in instructing the jury to find an intent to violate plaintiff's rights was not cured by the objective reasonableness instruction). The instruction on intent and negligence, without further explanation from the court, cannot be reconciled with the standard of objective reasonableness. The instruction provided to the jurors -- that if they found "the defendant's acts were merely negligent" they could not hold the defendant liable "even if . . . the plaintiff was harmed as a result of those particular acts" -- contradicts the instruction that force is excessive if it is objectively unreasonable, *i.e.*, beyond that which a reasonable and prudent officer would have applied. *See Fisher*, 234 F.3d at 317 ("Instructing the jury that more than negligence was required would likely confuse the jury as to the intent question.").

The error was also prejudicial. *See Hudson*, 271 F.3d at 70. Williams admitted that he applied force to Dancy as he bent Dancy over from his waist and pressed his body weight into Dancy's body. He did so deliberately, to put Dancy in a "position of disadvantage" against the hood of the car. J. App. 914.

-53-

The end result was that Dancy's jaw was broken. Williams offered no reasonable explanation for how Dancy could otherwise have been injured.

While Williams's defense focused largely on the identity of the assailant and the actual cause of the injury, his lawyer also suggested at trial that the injury was unintentional, stating, "I don't know what force it takes to break a jaw," and that medical evidence of a broken jaw is insufficient evidence of excessive force "even if you believe something happened out there." J. App. 976. Under the district court's instruction, the jury could have concluded that there was no violation because Williams did not intend to use enough force to break Dancy's jaw. But given Williams's admission that he intentionally used *some* amount of force on Dancy, it is irrelevant whether he intentionally applied force sufficient to break Dancy's jaw or otherwise intended to injure Dancy.

Williams seized Dancy, and, by his own admission, he did so intentionally. Hence the Fourth Amendment was implicated. If indeed he broke Dancy's jaw -- and there does not appear to be any other explanation -- it matters not whether he intended to do so or to otherwise injure Dancy. Therefore, a new trial is warranted.

## CONCLUSION

For the reasons set forth above, the judgment of the district court in favor of Elting against McGinley is AFFIRMED, and the judgment in favor of Williams is VACATED and the case is REMANDED for a new trial with respect to Dancy's claim against Williams for the use of excessive force.