*Tardif v. City of New York*

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2019

(Argued:  April 13, 2020      Decided:  March 18, 2021)

No. 19-1360

_____

MARY M. TARDIF,

*Plaintiff-Appellant,*

— v. —

CITY OF NEW YORK, SERGEANT THOMAS MCMANUS, IN HIS INDIVIDUAL AND
OFFICIAL CAPACITY,

*Defendants-Appellees,*

NEW YORK CITY POLICE DEPARTMENT, DEPUTY COMMISSIONER JOHN O'CONNELL,
DEPUTY INSPECTOR DANIEL MULLIGAN, DEPUTY INSPECTOR EDWARD WINSKI,
POLICE OFFICER JAMES MCNAMARA, POLICE OFFICER ALENA AMINOVA, POLICE
OFFICER KENDAL CREER, POLICE OFFICER MARSHA RUMBLE, POLICE OFFICER FELIX
SCHMIDT, JOHN DOE, NYPD OFFICERS #1-13, JOHN DOE, NYPD OFFICERS #1-11,
JOHN DOE, NYPD OFFICERS #1-9, JOHN DOE, NYPD OFFICER #11,

*Defendants.*[*]

_____

_____

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

Before:  LIVINGSTON, *Chief Judge*, PARKER and BIANCO, *Circuit Judges*.

Following confrontations with New York City police officers during Occupy Wall Street demonstrations at Union Square Park in the spring of 2012, Mary M. Tardif brought suit against the City of New York, the New York City Police Department, and various officers and officials. As relevant on appeal, Tardif alleged that (1) the City violated the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, in failing to reasonably accommodate her epilepsy by timely administering medication during her pre-arraignment detention following her arrest, and that (2) Sergeants Giovanni Mattera and Thomas McManus committed assault and battery under New York law when, during separate demonstrations, each officer used force against Tardif. The United States District Court for the Southern District of New York (Wood, *J.*) granted summary judgment to the City on Tardif's ADA claim and, following a six-day trial, a jury returned a verdict in favor of the City and the individual officers on all the remaining claims. We conclude that the district court properly granted summary judgment on the ADA claim because there was no evidence demonstrating the City delayed administering medication "by reason of" Tardif's disability, as required under the statute. With respect to the state law assault and battery claims, we hold that the district court correctly determined, contrary to Tardif's contention, that a justification instruction was warranted on those claims because New York law permits a police officer, even in a non-arrest situation, to use an objectively reasonable degree of force in the performance of a public duty, including crowd control. However, we conclude that the district court, in providing that justification charge, erroneously instructed the jury that it could consider an officer's subjective intent, which is contrary to New York's objective reasonableness inquiry. We further conclude that, although the error was prejudicial as it relates to the assault and battery claims involving Sergeant Mattera and warrants a new trial, the error was harmless as to the claims against Sergeant McManus given that his subjective good faith was never raised, or even at issue, during the trial.

Accordingly, we **AFFIRM** the judgment in part, **VACATE** in part, and **REMAND** the case for further proceedings consistent with this opinion.

STEFAN H. KRIEGER (Gabriella MP. Klein, Lindsay A. Wasserman, James P. Stevens, Law Students, *on the brief*), Hofstra Law Clinic, Maurice A. Deane School of Law at Hofstra University, Hempstead, NY; Gideon Orion Oliver, New York, NY, *on the brief, for Plaintiff-Appellant*.

JONATHAN A. POPOLOW, Assistant Corporation Counsel (Richard P. Dearing, Aaron M. Bloom, *on the brief*), *for* James E. Johnson, Corporation Counsel for the City of New York, New York, NY, *for Defendants-Appellees*.

JOSEPH F. BIANCO, *Circuit Judge*:

Following confrontations with New York City police officers during Occupy Wall Street demonstrations at Union Square Park in the spring of 2012, Mary M. Tardif brought suit against the City of New York ("the City"), the New York City Police Department ("NYPD"), and various officers and officials. As relevant on appeal, Tardif alleged that (1) the City violated the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, in failing to reasonably accommodate her epilepsy by timely administering medication during her pre-arraignment detention following her arrest, and that (2) Sergeant Giovanni Mattera ("Sergeant Mattera") and Sergeant Thomas McManus ("Sergeant McManus") committed assault and battery under New York law when, during

separate demonstrations, each officer used force against Tardif. The United States District Court for the Southern District of New York (Wood, *J.*) granted summary judgment to the City on Tardif's ADA claim and, following a six-day trial, a jury returned a verdict in favor of the City and the individual officers on all the remaining claims.

We conclude that the district court properly granted summary judgment on the ADA claim because there was no evidence demonstrating the City delayed administering medication "by reason of" Tardif's disability, as required under the statute. With respect to the state law assault and battery claims, we hold that the district court correctly determined, contrary to Tardif's contention, that a justification instruction was warranted on those claims because New York law permits a police officer, even in a non-arrest situation, to use an objectively reasonable degree of force in the performance of a public duty, including crowd control. However, we conclude that the district court, in providing that justification charge, erroneously instructed the jury that it could consider an officer's subjective intent, which is contrary to New York's objective reasonableness inquiry. We further conclude that, although the error was prejudicial as it relates to the assault and battery claims involving Sergeant Mattera

2

and warrants a new trial, the error was harmless as to the claims against Sergeant

McManus given that his subjective good faith was never raised, or even at issue,

during the trial. Accordingly, we affirm the judgment in part, vacate in part, and

remand the case for further proceedings consistent with this opinion.

## BACKGROUND

I. **The March 17, 2012 Arrest and Epileptic Seizure**[1]

In September 2011, protestors took to the streets of New York City's

Financial District in a demonstration against rising economic inequality in

America. Those protesting as part of Occupy Wall Street, as the movement became

known, encamped in Zuccotti Park in Lower Manhattan until NYPD officers

cleared the site in November 2011. On March 17, 2012, protestors returned to

Zuccotti Park to commemorate the six-month anniversary of the Occupy Wall

Street movement. In the early afternoon, Tardif and approximately thirty other

protestors were participating in call-and-response chants on the north sidewalk of

Zuccotti Park along Liberty Street. Speaking over a bullhorn, an NYPD official

---

[1] Because Tardif's ADA claim stemming from her March 17, 2012 arrest was dismissed at summary judgment, we must "accept as true the facts that were sworn to or undisputed," *Green v. Town of East Haven*, 952 F.3d 394, 407 (2d Cir. 2020), "examining the evidence in the light most favorable to, and drawing all inferences in favor of" Tardif, *Williams v. Annucci*, 895 F.3d 180, 186 (2d Cir. 2018) (internal quotation marks omitted).

3

ordered the crowd to clear the sidewalk because it was blocking pedestrian traffic. In response, Tardif and other protestors did not move but began jumping, yelling, and dancing in place. After additional orders to clear the sidewalk were ignored, police officers arrested multiple protestors, including Tardif.[2]

Following her arrest, Tardif was transported to a local precinct at around 3:30 p.m., where she was searched, processed, and placed in a holding cell. During her processing, Tardif informed Officer Victor Lara ("Officer Lara") that she had epilepsy and that her medication (Lamictal) was among the over 100 medical supplies in her backpack, which she carried as a volunteer "street medic" during the protests. App'x at 451. Officer Lara told Tardif that all of her personal items would need to be inventoried unless Tardif had someone pick up her belongings. Tardif agreed to have a friend collect her possessions and signed a form authorizing her friend to collect "all of her belongings," *id.* at 378, but informed Officer Lara that her friend was only authorized to collect her backpack and that her epilepsy medication should remain with her at the precinct. Her epilepsy medication was located in a small bag inside her backpack. At around 8:30 p.m., Tardif's friend arrived at the precinct to collect her belongings.

---

[2] Tardif was later charged and pleaded guilty to disorderly conduct in violation of New York Penal Law § 240.20.

After learning of Tardif's medical condition during processing, Officer Lara informed Tardif that she would be taken to the 20th Precinct, a special medical precinct where her medicine could be administered. Following NYPD procedures, Officer Lara filled out a medical treatment form used for detainees with medical needs, noting that Tardif had self-administered her epilepsy medication prior to her arrest. Officer Lara also assured Tardif that her medication would follow her to the 20th Precinct.

Tardif, who had a history of epileptic seizures, maintained a schedule where she took Lamictal at 10:00 a.m. and 10:00 p.m. daily. Tardif asserts that, at around 5:00 p.m., she told an unidentified officer that she needed to take her medication at 10:00 p.m., who responded, "Yeah, sure." *Id*. at 456. Tardif further alleges that, from 7:00 p.m. to 10:00 p.m., she repeatedly informed two unidentified male officers that she needed to take her medication, but they did not respond to her repeated requests for the medication.

At around 11:00 p.m., Tardif and other detainees were transferred to Manhattan Central Booking where an emergency medical technician ("EMT") determined whether the detainees had medical conditions requiring special attention. Tardif told an EMT about her epileptic condition, which, under NYPD

5

policy, required her to be medically cleared by a health professional before arraignment.

Then, at around 1:30 a.m., on what was then March 18, 2012, Officer Lara transported Tardif to Bellevue Hospital for medical clearance due to her history of epileptic seizures and use of epilepsy medication. After Officer Lara informed medical staff that Tardif required epilepsy medication, Tardif's attending physician provided her with a generic version of Lamictal (although her prescription was for Lamictal XR) and documented in her medical records that Tardif reported "no physical or medical complaints." *Id*. at 142. After being cleared medically, Tardif was ultimately transported by Officer Lara to the 20th Precinct around 4:30 a.m.

Officer Cystallee Otero ("Officer Otero"), the cell attendant that morning, was assigned to monitor Tardif and five other female detainees with medical needs. At around 7:00 a.m., after Officer Otero introduced herself, Tardif informed Officer Otero that she had epilepsy and needed her medication. Officer Otero responded that "she would speak to a supervisor to ensure that [Tardif] got [her] medication." *Id*. at 460. Officer Otero left and returned, telling Tardif that "it generally takes about an hour to get a prisoner medication" and that "they would

6

try to get [Tardif her] medication soon." *Id*. According to Tardif, Officer Otero checked on her "regularly" for the next three to four hours and "expressed her concern" for Tardif's epileptic condition. *Id*. During this time, Officer Otero also "repeatedly told [Tardif] that she was trying to obtain attention for [Tardif], but she was not getting a response from her superiors." *Id*.

In the early afternoon, Officer Otero observed Tardif begin to shake, lose consciousness, and collapse to the floor of her cell. Officer Otero retrieved the keys to the cell, turned Tardif on her side, and held her until she regained consciousness. Shortly after being dispatched, EMTs arrived at around 2:00 p.m. and transported Tardif to Bellevue Hospital by 2:15 p.m., where she received a dose of Lamictal and was again medically cleared for arraignment. Tardif was transferred back to the 20th Precinct, arraigned that evening, and released on her own recognizance.

## II. The Two Police Confrontations on March 21, 2012

### A. The Early Morning Incident

At trial, the parties testified regarding two confrontations between Tardif and NYPD officers that occurred during Occupy Wall Street demonstrations in the early morning and afternoon of March 21, 2012. The previous evening, around

7

eighty to one-hundred protestors encamped inside Union Square Park, and about seventy police officers in the area monitored the demonstration. Around midnight, a line of police officers moved southward through the park ordering, and sometimes physically moving, protestors out. After clearing the area, officers placed metal barricades along the park's southern stairs, with about forty police officers stationed on the inside of the barricades and the group of eighty to one-hundred protestors congregated outside along the 14th Street plaza. The remaining thirty or so officers stationed themselves about ten feet to the east and west of the protestors. Among these officers was Sergeant (now Lieutenant) Mattera, who was deployed to Union Square Park for crowd control.

After being removed from the park, the demonstrators, including Tardif, began shaking the metal barricades and yelling at the officers. At around 2:00 a.m., police officers told protestors that sanitation workers would confiscate and discard any unattended property. Daniel Shockley, a volunteer legal observer with a non-profit organization, and Stephanie Shockley, his wife, testified that officers moved into the crowd and, in some cases, confiscated items that people were standing next to and, in other cases, grabbed items out of people's hands and passed them

8

to sanitation workers for disposal. According to Tardif, one officer confiscated her backpack.

Tardif testified that, after confiscating unattended property, the officers on both sides of the protestors moved their lines inward, causing the protestors to back into each other. According to Tardif, an unidentified officer then came through the police line and shoved her in the chest with his baton, causing her to hit the ground. Tardif testified that, as she rose to her feet and "took a couple of steps," Sergeant Mattera "quickly" approached her and grabbed her shirt. *Id*. at 893-94. Tardif—then a 23-year-old, standing 5'1'', and weighing 175 pounds—testified that Sergeant Mattera "twisted and threw [her] away from him" onto the ground. *Id*. at 894. As Tardif hit the ground, her head struck the pavement, causing her to sustain a concussion and lose consciousness. Tardif testified that, prior to her interaction with Sergeant Mattera, she "had not put [her] hands on any other officer" and was six or seven feet from the closest officer when he grabbed her. *Id*. at 897.

Daniel Shockley testified similarly. He stated that, about ten feet from him, he observed Tardif "just standing with other protestors a few feet away from the police" and that he "saw an officer lunge out of the group of police officers and

grab" Tardif. *Id*. at 703-04. According to Shockley, Sergeant Mattera "spun [Tardif] around" and "threw her backwards." *Id*. at 704. He further testified that Tardif "landed on her back" and the back of her head "hit the sidewalk." *Id*. at 705-06. Shockley then stated that, after this confrontation, protesters began yelling for a medic, but Sergeant Mattera did not move toward Tardif or attempt to render any aid after pushing her.

For his part, Sergeant Mattera testified to a different version of events. According to Sergeant Mattera, Tardif suddenly appeared in his field of vision and "looked as if she was about to run into the back of [another] police officer." *Id*. at 797. It also "looked like she had her hands on the back of [a] police officer." *Id*. at 776. In an effort to "prevent the situation from further escalating," *id*. at 801, he "instinctively" grabbed Tardif and "pull[ed] her off to the side," *id*. at 797, causing her body to "twist[] around" toward him, *id*. at 781. Sergeant Mattera further testified that his "intention was to pull her off to the side and get her away from the police officer that she was running into," *id*. at 800, but "she was a lot heavier than [he] expected" and, during this motion, he "lost grip of her and she fell down," *id*. at 797. According to Sergeant Mattera, he did not intend for Tardif to fall to the ground and was unable to break her fall. He also testified that he did

10

not believe that he "could have used less force to accomplish [his] goal." *Id*. at 802-03. He further explained that he did not place Tardif under arrest because he "didn't feel like she knew what she was doing." *Id*. at 801. He thought "she was running up to see what was going on" and it was a "coincidence that . . . the one person that she ran behind was a uniformed police officer."[3] *Id*. at 801.

Shortly after the incident, an ambulance arrived and Tardif was thereafter transported to Beth Israel Hospital at 4:00 a.m., where she was diagnosed with and treated for a concussion, and given a soft cast and crutches for a sprained ankle.

## B. The Afternoon Incident

After receiving treatment at Beth Israel Hospital, Tardif returned to Union Square Park later that same morning in order to confront the then-unidentified officer with whom she had the earlier incident. At that time, there were around forty to fifty protestors inside the park and an estimated sixty to seventy-five police officers stationed in the park for crowd control. According to Sergeant McManus, the protestors in the park were taunting the police.

---

[3] Frame-by-frame video footage of the encounter, although not capturing the lead-up, shows Sergeant Mattera's left hand clenched onto the back of Tardif's shirt near her midsection. Tardif is subsequently seen falling backwards. Tardif lands several feet from where Sergeant Mattera contacted her. Protestors in the background can then be heard shouting for a medic. Daniel Shockley can be seen in the video watching the encounter as it transpired.

11

Sometime that afternoon, Sergeant McManus and ten to fifty other officers formed a police line around one of the protestors who was being arrested in order to prevent others from interfering with the arrest. Tardif testified that, when she arrived at the park, she walked up and down the police line with her crutches from a few feet away. According to Tardif, while she was moving, Sergeant McManus came "through the line . . . and pushed" her. *Id.* at 905. Tardif fell backwards off of her crutches and hit the ground, although two bystanders broke her fall. Tardif further testified that Sergeant McManus then "turned and walked back behind the police line." *Id.* at 907. Tardif was not arrested.

However, during Sergeant McManus's testimony, he categorically and repeatedly denied using any force against Tardif. In particular, Sergeant McManus explained that, while standing in the police line, he thought one protestor "was going to try to go by [him], and then [he] looked to [the] left and saw Mary Tardif on the ground." *Id*. at 825. Thus, according to Sergeant McManus, the first time he saw Tardif was when he "turned around and saw her

. . . on the floor" approximately ten to fifteen feet from him. *Id*. at 826. He emphasized that his hand never touched Tardif.[4]

## III. Procedural History

Tardif brought this action in the Southern District of New York on June 13, 2013 and, following discovery, filed the operative complaint on January 15, 2016. As relevant here, Tardif alleged that the City violated the ADA in failing to reasonably accommodate her epilepsy by providing access to her epilepsy medication while in police custody on the morning of March 18, 2012. She also alleged that Sergeants Mattera and McManus, in the course of their employment as police officers, committed assault and battery against her in violation of New York law.

### A. Summary Judgment

On June 1, 2016, the City moved for summary judgment on, *inter alia*, Tardif's ADA claim, her assault and battery claims against Sergeant McManus individually, and her *respondeat superior* claim against the City arising from the alleged assaults and batteries, in separate incidents, by Sergeants Mattera and

---

[4] During his testimony, Sergeant McManus was shown a photograph of the incident and he asserted that it showed at least three people between Sergeant McManus and Tardif as she was falling.

McManus.[5] Tardif opposed the motion. On February 6, 2017, the magistrate judge issued a report and recommendation on the City's motion.

On March 22, 2017, the district court conducted a *de novo* review of the report and recommendation, adopting some of the recommendations but not others. The district court, *inter alia*, granted summary judgment on the ADA claim, concluding that "[m]ere failure [to] attend to the medical needs of a person in custody does not in itself violate the ADA." Special App'x at 53. The district court denied summary judgment on the assault and battery claims against Sergeant McManus individually, finding that there was a genuine dispute of material fact as to whether his use of force was reasonable. The district court granted summary judgment on the *respondeat superior* claim against the City.

On August 23, 2017, following cross-motions for reconsideration, the district court adhered to its ruling on the ADA claim and explained that, to the extent Tardif was also attempting to assert the claim under a "reasonable accommodation" theory, there was no evidence that any failure by the City to provide Tardif with her epilepsy medication "was due to her disability." *Id*. at 64-

---

[5] Unlike Sergeant McManus, Tardif did not name Sergeant Mattera as a defendant in her lawsuit, but rather only sought to hold the City liable for his alleged assault and battery under a *respondeat superior* theory of liability.

65. The district court, however, granted Tardif's motion for reconsideration to the extent that it had granted summary judgment to the City with respect to the *respondeat superior* claim that was based on her assault and battery claims under New York law (which had survived summary judgment), and it allowed that *respondeat superior* claim to also proceed to trial. The district court also denied the defendants' motion for reconsideration on Tardif's underlying assault and battery claims against Sergeant McManus.

## B.     The Trial

As relevant here, three claims proceeded to trial arising from Tardif's two encounters with police on March 21, 2012, neither of which resulted in her arrest: (1) a Fourteenth Amendment excessive force claim under 42 U.S.C. § 1983 against Sergeant McManus individually; (2) assault and battery claims under state law against Sergeant McManus individually; and (3) a *respondeat superior* claim against the City predicated on the alleged assaults and batteries by Sergeant Mattera and Sergeant McManus in different incidents. Tardif also proceeded to trial on, *inter alia*, her *respondeat superior* claim predicated on additional assaults and batteries allegedly committed by several officers during a separate protest near Federal Hall in the Financial District on April 16, 2012, which resulted in her arrest.

15

With respect to the jury instructions, the district court gave a justification instruction for the assault and battery claims, over Tardif's objection, that allowed the jury to consider the reasonableness of the officer's force, including the officer's subjective intent. The justification instruction focused on the use of force to effect an arrest. During deliberations, in response to a juror note regarding the applicable standard in a non-arrest context, the district court provided the same justification instruction, again over Tardif's objection. The jury subsequently reached a verdict in favor of the City and the individual officers on all of Tardif's claims.

This appeal followed.

## DISCUSSION

### I.      The ADA Claim

Tardif asserts that the City failed to provide a reasonable accommodation under the ADA by not adequately responding to her requests for medication for her disability (epilepsy) while she was in police custody prior to her arraignment, and that the district court erred in granting summary judgment for the City on that claim.

We review *de novo* a district court's grant of summary judgment, resolving all ambiguities and drawing all permissible factual inferences in favor of the non-moving party. *See Garcia v. Hartford Police Dep't*, 706 F.3d 120, 126-27 (2d Cir. 2013). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the non-movant bears the burden of proof at trial, the movant's initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

More than thirty years ago, Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The Act's first three titles prohibit discrimination against individuals with disabilities "in three major areas of public life": employment and hiring (Title I); public services, programs, and activities (Title II); and public accommodations (Title III). *Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied

17

the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  *Id.* § 12131(2).  A "public entity" includes "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government."[6]  *Id.* § 12131(1)(A)-(B).

To establish a claim under Title II, a plaintiff must demonstrate "(1) that she is a qualified individual with a disability; (2) that she was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to her disability."  *Davis v. Shah*, 821 F.3d 231, 259 (2d Cir.

---

[6] The term "'discrimination,' which is not defined in Title II, may take its meaning from Title I."  *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 n.7 (2d Cir. 2003) (citation omitted). Title I of the ADA states, in relevant part, that the term "discriminate against a qualified individual on the basis of disability" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . , unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation . . . of such covered entity."  42 U.S.C. § 12112(b)(5)(A).

2016) (internal quotation marks omitted). A plaintiff may base her Title II claim on any of three theories of liability: disparate treatment (intentional discrimination), disparate impact, or failure to make a reasonable accommodation. *See Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009); *accord Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 144-45 (1st Cir. 2014) (detailing the three theories).

Here, Tardif proceeded solely under a reasonable accommodation theory. There is no dispute that Tardif, who suffers from epilepsy, qualifies as an "individual with a disability" under Title II. *See* 42 U.S.C. § 12102(1)(A) (defining "disability" under the ADA as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual"); 28 C.F.R. § 35.108(b)(2) (classifying epilepsy as a "[p]hysical or mental impairment"). Nor is there a dispute that the City constitutes a "public entity" under Title II. Moreover, it is clear that access to custodial medical services available throughout an arrestee's pre-arraignment detention constitutes "services, programs, or activities" of the City. [7] *See United States v. Georgia*, 546 U.S. 151, 157 (2006) (noting that "medical

---

[7] In her reply brief, rather than continuing to link the application of the ADA to custodial medical services, Tardif seeks to extend her legal claim by arguing more broadly that "a safe custodial environment" was the "benefit" that the City denied her under the ADA by failing to timely provide medication for her epilepsy. Reply Br. at 4-5. We decline to address the broader issue because "[i]ssues raised for the first time in a reply brief are generally deemed waived," *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir.

care" constitutes part of a prison's "services, programs, or activities" (quoting 42

U.S.C. § 12132 and citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998))); *see*

*also Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (stating that

prison medical services constitute "programs, services, or activities" under Title

II).

This case thus presents the following legal question for this Court to resolve:

whether the alleged failure by the police to provide custodial medical services to

Tardif in a timely and adequate manner prior to her arraignment, by itself,

constitutes a failure to make a reasonable accommodation "by reason of" an

individual's disability under the ADA.  We hold that it does not.

In *Henrietta D. v. Bloomberg*, we addressed the proper standard of causation

for a reasonable accommodation claim.  331 F.3d 261, 278-80 (2d Cir. 2003).  There,

a New York City agency dedicated to assisting HIV-positive residents routinely

failed to provide such residents with adequate access to public assistance benefits

and services due, in part, to "systemic breakdowns" and bureaucratic dysfunction.

*Id.* at 264, 273, 278.  In determining whether plaintiffs had established that the

---

2010), but note that whether Title II applies more broadly in arrest situations has divided our sister circuits, *see City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1772-74 (2015) (dismissing the question as improvidently granted); *see also id.* at 1778-79 (Scalia, J., concurring in part and dissenting in part) (noting circuit split).

agency had denied them public services "by reason of" their disabilities where there were multiple potential causes of the denial, we held that, "[i]n assessing whether one cause among many constitutes [a] proximate cause," *id.* at 278, plaintiffs must establish that their "disabilities were a substantial cause of their inability to obtain services," rather than "so remotely or insignificantly related to their disabilities as not to be 'by reason' of them," *id.* at 279. "Quite simply," we concluded, "the demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities is sufficient to sustain a claim for a reasonable accommodation." *Id.* at 277.[8]

Applying that standard here, there is no evidence (or even an allegation) that Tardif's disability made it difficult in any way for her to access benefits—namely, medical services—that were available to all pretrial detainees. In other words, Tardif's epilepsy did not interfere with her ability to access medical services, and not even her operative complaint alleges a connection between the City's alleged delay in administering epilepsy medication and any disability-based reason on the City's part. In the complete absence of evidence that Tardif's

---

[8] Although "the basic analytical framework of the ADA includes . . . a comparative component," "[i]t does not follow . . . from this framework that a plaintiff must also demonstrate disparate impact in all cases," including reasonable accommodation claims. *Henrietta D.*, 331 F.3d at 276.

21

epilepsy caused a deprivation of medical services, the fact that her disability was her motivation for seeking out such services does not suddenly transform her allegations regarding the inadequate medical treatment into a "failure to accommodate" claim. At its core, the issue here is not whether Tardif was denied medical services *because* she has a disability. Instead, her claim relates solely to whether she received adequate medical treatment in police custody *for* her disability, and such a claim is not cognizable under the ADA. To hold otherwise would allow inmates to litigate in federal court virtually every medical malpractice claim arising in a custodial setting under the auspices of the ADA. Such a result is entirely at odds with the statutory language of Title II and its purpose.[9]

Our holding is consistent with prior case authority in this Circuit addressing analogous situations. For example, in *Doe v. Pfrommer*, we held that where an individual challenges "the substance of the services provided"—rather than

---

[9] We note that this holding does not leave pretrial detainees, such as Tardif, without a remedy; rather, such a claim for a denial of medical treatment can be pursued under 42 U.S.C. § 1983, as a due process claim under a deliberate indifference standard (as Tardif alternatively asserted in her complaint). *See, e.g.*, *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) ("[T]he official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need.").

"illegal discrimination"—there is no ADA violation.  148 F.3d 73, 84 (2d Cir. 1998).

Similarly, in *United States v. University Hospital*, we noted that "where medical treatment is at issue, it is typically the [disability] itself that gives rise to, or at least contributes to, the need for services" and thus held that Section 504 of the Rehabilitation Act "prohibits discrimination against a [disabled] individual only where the individual's [disability] is unrelated to, and thus improper to consideration of, the services in question."[10]  729 F.2d 144, 156 (2d Cir. 1984). Moreover, in *Cushing v. Moore*, we held that the Rehabilitation Act "does not create a cause of action based on a [disability] that is directly related to providing the very services at issue."  970 F.2d 1103, 1109 (2d Cir. 1992); *see also Schnauder v. Gibens*, 679 F. App'x 8, 10 (2d Cir. 2017) (summary order) (rejecting the assertion by an inmate that "denial of timely and meaningful medical treatment for his [broken] nose constituted a failure to provide a 'reasonable accommodation'").[11]

---

[10] "Because the standards imposed by Title II on public entities are generally equivalent to those of § 504" of the Rehabilitation Act, "we treat claims under the two statutes identically in most cases."  *Davis*, 821 F.3d at 259 (internal quotation marks omitted).

[11] Tardif's reliance on our decisions in *Wright*, 831 F.3d at 64, as well as *McGugan v. Aldana-Bernier*, 752 F.3d 224 (2d Cir. 2014), is entirely misplaced.  *Wright* involved a claim that, because of the plaintiff's mobility issues resulting from his disabilities, the prison denied the plaintiff meaningful access to programs and services that were routinely accessed by other inmates.  831 F.3d at 73.  In *McGugan*, we addressed a claim of intentional discrimination, and held that an actionable Rehabilitation Act claim existed for the denial of medical treatment "dictated by bias rather than medical knowledge."  752 F.3d at 231.

Several of our sister circuits have reached the same conclusion. *See, e.g.*, *Simmons v. Navajo County*, 609 F.3d 1011, 1022 (9th Cir. 2010) ("[T]o the extent that the [plaintiffs] argue that [the jail] violated the ADA by depriving [the inmate] of 'programs or activit[ies] to lessen his depression,' such argument is not actionable under the ADA. The ADA prohibits discrimination because of disability, not inadequate treatment for disability." (fifth alteration in original)), *overruled in part on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (*en banc*); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) ("[T]he Act would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. . . . The ADA does not create a remedy for medical malpractice.").

Tardif attempts to support her position by relying substantially on *Kiman v. New Hampshire Department of Corrections*, where a former inmate asserted violations of Title II based upon the prison's alleged failure to properly treat his disease (amyotrophic lateral sclerosis), and failure to accommodate his resulting disability. 451 F.3d 274, 276 (1st Cir. 2006). We find Tardif's reliance on *Kiman*

---

Therefore, neither of these holdings can be construed to eliminate the statutory requirement, in a reasonable accommodation case, that a plaintiff demonstrate that the treatment or services were denied because of a disability, rather than for a disability. In fact, in *McGugan*, we even warned against allowing "plaintiffs an almost unfettered ability to re-frame claims of medical malpractice into federal claims of discrimination on the basis of disability." *Id*. at 234.

24

unpersuasive. As a threshold matter, we note that the First Circuit affirmed summary judgment on the portion of the plaintiff's claim related to the prison's "actions regarding his diagnosis, medical consultations, physical therapy, or medical dosages" because the plaintiff failed to establish that such actions were "so unreasonable as to demonstrate that they were discriminating against him *because* of his disability." *Id*. at 285 (emphasis added). Moreover, although the court allowed the claim to survive summary judgment as to the alleged failure to provide adequate medications, the court noted that there was evidence that the corrections officers "routinely" failed to provide those medications "throughout [the plaintiff's] time in prison." *Id*. at 286. Thus, the court's reasoning suggested that, under the facts of that case, the "outright denial of medical services" to a disabled inmate over several months "despite his repeated requests" could allow the inmate to demonstrate at trial that such denial was because of his disability. *Id*. at 286-87. Here, by contrast, there is no evidence that the delay in providing Tardif's medication was more than an isolated and temporary incident; nor is there any indication that the City systematically delays or denies pre-arraignment detainees reasonable medical services for their disabilities.[12] Thus, *Kiman* is

<hr />

[12] In fact, notwithstanding the alleged denial of medication, there is uncontroverted evidence of the City's utilization of various standard procedures to address Tardif's

factually distinguishable. In any event, to the extent that the language in *Kiman* could be construed as providing a more general avenue to sue under the ADA any time there is an allegation by an inmate of a denial of medical services without the support of a "medical 'judgment'" by the prison, *Kiman*, 451 F.3d at 287, we respectfully disagree with such a holding.

Finally, apparently recognizing the deficient record, Tardif attempts to shift her burden to the City, arguing that the City's unexplained inaction following her requests for medication is sufficient evidence for her claim to go to a jury. But this *unexplained* failure to provide medication, by itself, does not allow for a reasonable inference that it was "by reason of" the individual's disability. At summary judgment, it is not the City's burden to proffer a justification for the delay or denial where the record is otherwise silent. Instead, Tardif bears the burden of

---

disability. Officer Lara documented Tardif's medical condition upon learning of her epilepsy. The City also transported Tardif to Manhattan Central Booking where she spoke with EMTs regarding her condition. Tardif was then transferred to Bellevue Hospital where medical professionals evaluated her condition. After Officer Lara informed medical staff that Tardif required epilepsy medication, her attending physician provided her with a generic version of Lamictal (although her prescription was for Lamictal XR), documented in her medical records that Tardif reported "no physical or medical complaints," and medically cleared her for arraignment. App'x at 142. The City then, as Tardif concedes, "transported her to the special medical precinct, precisely so she could access all the benefits available to those with medical conditions." Reply Br. at 5. Thus, despite Tardif's efforts to classify this case as involving the "knowing failure to provide *any* services" for her disability, *id*. at 8 (emphasis added), it is, at best, a claim of inadequate medical services due to an alleged delay in providing medication.

26

establishing causation at trial, and it was thus entirely proper for the City to merely note the lack of evidence of causation supporting her reasonable accommodation claim. *See Celotex Corp.*, 477 U.S. at 325. Because Tardif was unable to point to any facts in the record from which a reasonable jury could conclude that Tardif's epilepsy substantially caused the City's delay in administering medication, the district court correctly concluded that "[m]ere failure [to] attend to the medical needs of a person in custody does not in itself violate the ADA" under a reasonable accommodation theory. Special App'x at 53.

In sum, the record presents no facts from which a reasonable jury could infer that there was a disability-based reason for the delay in Tardif's medical services. Any shortcomings that existed in the provision of medical services *for* Tardif's epilepsy provide no basis to conclude that she was denied meaningful access to such services *because of* her disability, and thus the ADA claim fails as a matter of law. Accordingly, the district court properly granted summary judgment on the ADA claim.

## II. The Assault and Battery Claims

With respect to her assault and battery claims relating to Sergeants Mattera and McManus, Tardif argues that she is entitled to a new trial on several grounds.

As to the trial testimony, Tardif argues that the district court erred in restricting the questions that could be asked on her direct examination regarding her personal background. Tardif's remaining two grounds focus on the district court's instructions to the jury on the defense of justification—that is, assessing the reasonableness of the officer's use of force. In particular, Tardif contends that a justification defense by a police officer is applicable under New York law only in an arrest situation and, thus, the district court erred in applying that instruction to the use of force by officers against her on March 21, 2012, because no arrest was being made. Moreover, Tardif asserts that the justification instruction erroneously advised the jury that the officer's subjective intent was a permissible factor in assessing the reasonableness of the officer's conduct.

As set forth below, the district court did not abuse its discretion in sustaining objections to certain questions regarding Tardif's background. We also conclude that the district court correctly determined that a justification defense exists under New York law for police officers utilizing force in a non-arrest situation. However, as the defendants concede, the instruction given to the jury was erroneous because it suggested that there was a subjective element to the reasonableness analysis, even though New York law (like federal law) uses an objective standard to assess

28

an officer's use of force. We further conclude that, although the error was harmless as to the claim against Sergeant McManus (and the related *respondeat superior* claim against the City arising from Sergeant McManus's alleged conduct) because justification was not at issue with respect to the claims against him, the error likely prejudiced Tardif as to the jury's assessment of Sergeant Mattera's conduct and warrants a new trial on the *respondeat superior* claim against the City arising from his alleged assault and battery.

## A. The Evidentiary Challenge

Tardif contends that, during trial, the district court erred in limiting testimony regarding her personal background. Specifically, she contends that such testimony was necessary to demonstrate her commitment to social justice in order to rebut the City's opening argument that she had exaggerated her story and was only suing for the money.

In the City's opening argument, defense counsel contended that Tardif was "inventing and exaggerating" the events surrounding each of her claims at trial, App'x at 679, and that she "want[ed the jury] to give her money for those inventions and exaggerations," *id*. at 686. During Tardif's direct examination, in addition to other background testimony regarding her involvement in the Occupy

29

Wall Street movement, her counsel attempted to elicit testimony regarding the fact that Tardif adopted two children from Honduras who were refugees, that Tardif herself was adopted from Peru, and that she worked as a sign language interpreter for hearing-impaired children. Following multiple, sustained objections by defense counsel, the district court at side bar instructed Tardif's counsel that it did not "want [him] to elicit anything that plays upon the sympathy of jurors" but instead "to get right to the heart of matters." *Id*. at 879.

At the end of Tardif's direct testimony, plaintiff's counsel submitted an offer of proof as to how additional background testimony was necessary in order to rebut the City's theory that her lawsuit was simply motivated by money. The district court declined the request to elicit such additional evidence, concluding that Tardif's testimony had made clear "that her motives are pure and that she's trying to make the world a better place" by making sure that "people who are arrested [are] treated appropriately." *Id.* at 925-26. Tardif now challenges that evidentiary ruling.

We review evidentiary rulings for abuse of discretion and reverse only for manifest error. *See Manley v. AmBase Corp.*, 337 F.3d 237, 247 (2d Cir. 2003). Although relevant evidence is generally admissible, Fed. R. Evid. 402, district

courts "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403. Background evidence may provide necessary context to a witness's substantive testimony, but district courts have "wide discretion concerning the admissibility of background evidence." *United States v. Blackwell*, 853 F.2d 86, 88 (2d Cir. 1988).

Here, we conclude that the district court operated well within its broad discretion in limiting the scope of the testimony regarding Tardif's personal background. More specifically, the district court determined that the proffered testimony—namely, Tardif's adoption of two refugee children, her own adoption as a child, and her work as a sign language interpreter for hearing impaired children—might prejudice the jury by playing upon their sympathies and would waste time. Moreover, to the extent Tardif sought to introduce these details of her "social justice commitment" to rebut the City's accusation that she was motivated by money in making the allegations in the lawsuit, App'x at 879, Tardif was permitted to testify to other facts establishing her concerns for social justice. For example, Tardif testified about the purpose of the Occupy Wall Street movement,

31

why she became involved with the movement, how she remains a member of Occupy Wall Street, how she feels about being part of the movement, why she continued to participate in protests after November 2011, and how she contributed to the protests by "tend[ing] to" protestors injured during marches as a "street [medic]." *Id*. at 884-85. The district court also, over defense counsel's objection, allowed Tardif to testify as to why she brought this lawsuit. *See id*. at 924 ("I had originally wanted to make things better for people in custody that had disabilities so that there would be a standard protocol to treat people instead of just throwing them to the side."). Thus, contrary to Tardif's argument, the district court permitted Tardif, through her testimony, to rebut any suggestion by the City that she brought this action for financial reasons. Under these circumstances, it is well within a district court's discretion to determine, under Rule 403, that the probative value of any additional background testimony is substantially outweighed by the danger of unfair prejudice to the defendants because of juror sympathy and by the additional time that would be necessary to explore that background, especially where the district court concluded that there had already been "so much wasted time from [Tardif's] side." *Id.* at 879. Accordingly, we conclude that this

evidentiary determination by the district court was not an abuse of discretion and provides no basis for a new trial.

## B. Justification under New York Law

Tardif also contends that the district court erred by instructing the jury on the availability of a justification defense to assault and battery claims under New York law. "We review a claim of error in the district court's jury instructions *de novo . . . .*" *Sheng v. M&TBank Corp.*, 848 F.3d 78, 86 (2d Cir. 2017) (quoting *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 152 (2d Cir. 2014)). "A jury charge is erroneous if it misleads the jury as to the correct legal standard, or if it does not adequately inform the jury of the law." *Dancy v. McGinley*, 843 F.3d 93, 116 (2d Cir. 2016) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 552 (2d Cir. 1996)).

In describing the purported error in this case, Tardif takes the position that under state law, "any force used" in a non-arrest context "*must* give rise to a claim for assault and battery," and no justification is permitted. Appellant's Br. at 38-39. Contrary to Tardif's contention, New York courts have never articulated such a sweeping theory of assault-and-battery liability and we decline to do so here. Instead, as set forth below, we hold that New York law—consistent with federal Section 1983 excessive force jurisprudence—permits a police officer to use an

33

objectively reasonable degree of force in the performance of a public duty, including a non-arrest situation.

The elements of New York assault and battery and Section 1983 excessive force claims are "substantially identical." *Posr v. Doherty*, 944 F.2d 91, 94-95 (2d Cir. 1991). Under New York law, civil assault "is an intentional placing of another person in fear of imminent harmful or offensive contact." *Charkhy v. Altman*, 678 N.Y.S.2d 40, 41 (1st Dep't 1998) (internal quotation marks omitted); *accord Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001). Civil battery "is an intentional wrongful physical contact with another person without consent." *Charkhy*, 678 N.Y.S.2d at 41 (internal quotation marks omitted); *accord Girden*, 262 F.3d at 203. To succeed on assault or battery claims in the law enforcement context, a plaintiff must also demonstrate that the defendant officer's conduct "was not reasonable within the meaning of the New York statute concerning justification of law enforcement's use of force in the course of their duties." *Nimely v. City of New York*, 414 F.3d 381, 391 (2d Cir. 2005); *accord Jamison v. Metz*, 541 F. App'x 15, 20 (2d Cir. 2013) (summary order).

34

New York Penal Law § 35.30 establishes a justification defense for an officer's use of force in the performance of several enumerated public duties. The statute states, in relevant part, that:

> A police officer . . . may use physical force when and to the extent he or she reasonably believes such to be necessary to effect [an] arrest, or to prevent [an] escape from custody, or in self-defense or to defend a third person from what he or she reasonably believes to be the use or imminent use of physical force.

N.Y. Penal Law § 35.30(1).[13] Section 35.30(1) "requires the jury to conduct precisely the same analysis as does the reasonableness standard" under the Fourth Amendment. *Heath v. Henning*, 854 F.2d 6, 9 (2d Cir. 1988). Indeed, per the text of the statute, the use of physical force "when and to the extent [the officer] reasonably believes such to be necessary," is the "functional equivalent" of an objective reasonableness standard. *Id.* (alteration in original) (quoting N.Y. Penal Law § 35.30(1)). Although Tardif argues that this justification defense is limited to

---

[13] Although codified in New York's penal law compilation, New York courts have applied Section 35.30 to both civil and criminal claims against police officers. *Compare Brunelle v. City of New York*, 702 N.Y.S.2d 648, 648-49 (2d Dep't 2000) (applying the justification statute to civil action against the City by police officer seeking to recover damages from injury sustained from fellow officer in the course of performing their duties), *with People v. Colecchia*, 674 N.Y.S.2d 10, 11 (1st Dep't 1998) (applying the justification statute to manslaughter charge against police officer).

35

the circumstances enumerated in Section 35.30(1), and thus cannot apply to a non-arrest situation involving crowd control, we disagree for several reasons.

First, we have never limited public authority defenses under New York law to arrest situations. To the contrary, as noted above, we held in *Nimely* that, even though justification is a defense under New York Penal Law, a lack of justification is part of a plaintiff's burden of demonstrating the unreasonableness of an officer's action "in the course of their duties." 414 F.3d at 391.

Second, both the penal law and case authority in New York make clear the limited grounds for justification articulated in Section 35.30 are not meant to be exhaustive as it relates to any police action. With respect to the statutory framework, New York Penal Law § 35.05(1) states, in relevant part, that "use of physical force . . . is justifiable and not criminal when . . . [it] is performed by a public servant in the reasonable exercise of his *official powers, duties or functions*." *Id*. (emphasis added); *see also People v. Mattison*, 428 N.Y.S.2d 355, 357 (3d Dep't 1980) ("[Section 35.05(1)] is chiefly meant to afford limited protection when provisions defining malum prohibitum offenses are violated in the performance of official responsibilities.").[14] The New York Court of Appeals likewise, without

---

[14] Tardif's assertion that the New York Pattern Jury Instructions ("PJI") on a justification defense support her interpretation of New York law is also unavailing. Appellant's Br.

any reference to limitations on the use of force to arrest situations, has described the analysis of a police officer's use of force as more broadly focusing upon whether such force was "more than necessary under all the circumstances." *Jones v. State*, 33 N.Y.2d 275, 280 (1973) (analyzing force used by corrections officer during a riot at a prison under the same standard as would be used by the police in "making an arrest, maintaining someone in custody or investigating a traffic infraction"); *see also Kline v. State*, 278 N.Y. 615, 616 (1938) (finding that liability existed for an assault on plaintiff by troopers during a clash with a group of people on a highway trying to block a truck, where the force was "without cause or provocation and unjustifiable"); *Disla v. City of New York*, 986 N.Y.S. 2d 463, 465 (1st Dep't 2014) (stating that "battery committed in the performance of a public duty" requires "excessive force").

Pursuant to this legal framework, New York courts have dismissed assault and battery claims in non-arrest situations where it was clear from the record that

---

at 37 (citing 2A N.Y. PJI–Civil 3:4).  The pattern instruction is based upon New York Penal Law § 35.30 and discusses the circumstances enumerated in that section, including an arrest.  However, nothing in the PJI suggests that such situations are exclusive.  To the contrary, the instruction at issue is broadly entitled "Battery Committed in *Performance of Public Duty or Authority*."  2A N.Y. PJI–Civil 3:4 (emphasis added).  Moreover, the comment for this instruction also broadly references "performance of a public duty," which would undoubtedly include crowd control by a police officer. *See id.* cmt. at 24-25.

the use of force was justified and reasonable.  In *Harris v. City of New York*, for example, the Second Department affirmed the dismissal of assault and battery claims because officers, while executing a search warrant for the plaintiff's house, used "reasonable force to effectuate the detention of the occupants" by handcuffing them for the duration of the search.  62 N.Y.S.3d 411, 413-14 (2d Dep't 2017) (internal quotation marks omitted).  Likewise, in *Ahmad v. City of New York*, the First Department held that "minor contact between plaintiff's and the officer's hands did not constitute excessive force," where an officer effecting a traffic stop on foot made contact with the plaintiff while reaching into the car for the gear shift.[15]  101 N.Y.S.3d 48, 49 (1st Dep't 2019).

Finally, we note that Tardif's position would render a police officer incapable of performing some of his or her most basic functions and responsibilities using reasonable force, without being subject to civil liability for

---

[15] In this regard, New York law is entirely consistent with the scope of the analysis of a police officer's use of force under the Fourth Amendment in both arrest and non-arrest situations.  More specifically, in *Graham v. Connor*, the Supreme Court recognized that, where the use of force occurs "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen," courts should analyze the reasonableness of the use of force, which generally requires "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  490 U.S. 386, 395-96 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

assault or battery. In other words, if an officer's ability to lawfully use any force is constrained to the narrow contours of Section 35.30, a police officer would have no authority to make any degree of physical contact in the performance of a plethora of non-arrest duties, such as patting down a suspect during a traffic stop, stopping a distracted pedestrian from walking into oncoming traffic, or engaging in basic crowd control on New Year's Eve in a packed Times Square or at a large demonstration. Thus, Tardif's interpretation of New York law is not only contrary to the relevant case authority, but also defies logic from a practical standpoint. *See Jones v. Parmley*, 465 F.3d 46, 56-57 (2d Cir. 2006) (Sotomayor, J.) ("It is axiomatic, for instance, that government officials may stop or disperse public demonstrations or protests where 'clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears.'" (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940))); *see also Edrei v. Maguire*, 892 F.3d 525, 541-42 (2d Cir. 2018) ("Our sister circuits and district courts in this Circuit have routinely applied excessive force principles to crowd control situations. Training our focus on controlling authority, we see that this Court has repeatedly emphasized that officers engaging with protesters must

comply with the same principles of proportionality attendant to any other use of force." (citations omitted)).

Accordingly, although neither of the two police encounters at issue on March 21, 2012 involved Tardif's arrest, we hold that the district court correctly determined, under New York law, that the jury should be given an instruction regarding justification in connection with Tardif's assault and battery claims involving Sergeants Mattera and McManus as it related to their alleged use of force on that date.

## C. The Justification Instruction

Tardif further argues that the justification instruction that the district court provided to the jury on the assault and battery claims was erroneous because it included a subjective element in the jury's assessment of the reasonableness of the officers' use of force. We agree.

When charging the jury regarding the assault and battery claims prior to the commencement of deliberations, the district court instructed that assault is "the intentional placing of another person in fear of imminent harmful or offensive conduct," and that battery occurs when a person "intentionally touches another person without that person's consent and thereby causes an offensive bodily

contact." App'x at 1076-77. The district court explained that, when an alleged assault or battery occurred during a lawful arrest, a plaintiff must prove that the police conduct or use of force was "unreasonabl[e] under the circumstances." *Id*. at 1077; *see also id*. at 1078 ("If the alleged battery occurred during a lawful arrest, plaintiff must also prove that the officers' use of force was unreasonable in light of the circumstances."). The district court further instructed—over Tardif's objection—that, in determining whether the officers "acted unreasonably under the circumstances," the jury "may consider the need for the application of force, the relationship between the need and the amount of force that was used, the extent of any injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline, or maliciously for the very purpose of causing harm." *Id*. at 1077 (instruction concerning assault); *see also id*. 1078 (same with respect to battery). The district court failed to provide additional instructions regarding assault and battery claims in a non-arrest context.

On the morning the deliberations began, the jury sent a note, requesting to view all video evidence involving Sergeant Mattera at standard speed and in slow motion, and asking whether there is "anything unique about a police [officer] carrying out a law enforcement function (but not a lawful arrest) that should be

41

considered when assessing an assault and battery claim." *Id*. at 1203. The district

court—again over Tardif's objection—responded with a supplemental instruction

that repeated the initial charge that was given for an arrest situation:

> The answer to your question is that because police have the obligation
> to maintain the public peace and to keep individuals safe, you can
> determine whether they acted reasonably, and in determining that . . .
> you may consider the need for the application of force, the
> relationship between the need and the amount of force that was used,
> the extent of any injury inflicted, whether the force was applied in
> good faith—in a good faith effort to maintain or restore discipline—
> or maliciously for the very purpose of causing harm.

*Id*. at 1105. The district court's instruction was based upon our decision in *Johnson*

*v. Glick*, 481 F.2d 1028 (2d Cir. 1973), *partially rejected by Graham v. Connor*, 490 U.S.

386 (1989), where we addressed the relevant factors for a Fourteenth Amendment-

based excessive force analysis for pretrial detainees.

We conclude, as the City concedes, that the subjective intent language in the

initial instruction, as well as in the supplemental instruction, was erroneous. It is

well settled under New York law, with respect to assault and battery claims, that

the use of force by a police officer is analyzed "under the Fourth Amendment and

its standard of objective reasonableness." *Hernandez v. Denny's Corp.*, 114 N.Y.S.3d

147, 151 (4th Dep't 2019) (internal quotation marks omitted); *accord Harris*, 62

N.Y.S.3d at 414. Thus, New York law is consistent with the Supreme Court's

Fourth Amendment jurisprudence, as set forth in *Graham*, which explicitly rejected the argument that the use of *Glick*'s "malicious and sadistic" factor is "merely another way of describing conduct that is objectively unreasonable under the circumstances." 490 U.S. at 397. The *Graham* Court explained that "[w]hatever the empirical correlations between 'malicious and sadistic' behavior and objective unreasonableness may be, the fact remains that the 'malicious and sadistic' factor puts in issue the subjective motivations of the individual officers, which our prior cases make clear has no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment." *Id*. Thus, the Court emphasized that "[t]he Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, and subjective concepts like 'malice' and 'sadism' have no proper place in that inquiry." *Id*. at 399; *accord Heath*, 854 F.2d at 9 ("There is no room for consideration of the officer's motives or intent under this standard . . . and no requirement that an officer have acted with an improper motive in order to have acted unreasonably.").[16]

---

[16] We also note that, even with respect to excessive force claims under the Fourteenth Amendment (from which the *Glick* framework derived), the Supreme Court has limited the application of the *Glick* factors and clarified the applicable standard for such claims brought by pretrial detainees. More specifically, in *Kingsley v. Hendrickson*, although noting that the fourth *Glick* factor (*i.e.*, a malicious and sadistic purpose to cause harm) "might help show that the use of force was excessive," 576 U.S. 389, 402 (2015), the

In short, the jury should not have been told that, in assessing the reasonableness of the police officer's use of force, they could consider "whether the force was applied in good faith—in a good faith effort to maintain or restore discipline—or maliciously for the very purpose of causing harm." App'x at 1105 (supplemental jury instruction); *see also id.* at 1077-78 (initial jury instruction). Once it is demonstrated that an individual police officer intended to use force of some kind, the subjective motivations of that officer simply have no bearing on whether the particular degree of force used is unreasonable and excessive under the Fourth Amendment or New York law. Accordingly, because the district court's initial instruction and supplemental instruction on the assault and battery claims incorporated a subjective element, those instructions were erroneous.

## C. Harmless Error Analysis

Although conceding that the district court incorrectly charged the jury on the officers' subjective intent, the City argues that Tardif has failed to demonstrate sufficient prejudice warranting a new trial on her assault and battery claims. We

Supreme Court emphasized that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one," *id*. at 397; *see also Edrei*, 892 F.3d at 537 (describing *Kingsley*'s "new formulation" of an excessive force claim under the Fourteenth Amendment as "a modest refinement of *Glick*'s four-factor test" because "our own precedents . . . have repeatedly assessed excessive force claims without looking to subjective intent").

hold that the charging error prejudiced Tardif's assault and battery claims involving Sergeant Mattera (as asserted against the City), but that the error was harmless as to her claim against Sergeant McManus, as well as the corresponding *respondeat superior* claim against the City.

An erroneous instruction requires a new trial if we find that the error is not harmless. *See Uzoukwu v. City of New York*, 805 F.3d 409, 418 (2d Cir. 2015). Error in a jury instruction is not harmless "when an appellant can show that the instructions considered as a whole prejudiced [her]." *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 521 (2d Cir. 1998); *see also Cobb v. Pozzi*, 363 F.3d 89, 118 (2d Cir. 2003) (erroneous instruction not harmless when "th[e] evidence could support a jury's reaching the opposite conclusion" had it been instructed correctly).

With respect to Sergeant Mattera, there are several factors that collectively preclude us from finding that the erroneous instruction was harmless. As a threshold matter, this is not a situation where the jury was initially provided with a correct instruction, and the district court then misspoke in re-stating the law at some other juncture in the charge. The jury was given the erroneous instruction on subjective intent during the initial charge when the elements of the assault and

45

battery claims were set forth, and that same erroneous instruction was reiterated in response to a jury note. Thus, the jury was *never* provided with the correct instruction on those claims. The City points to a portion of the initial charge where the district court discussed how the plaintiff must show that "any force used was objectively unreasonable" and "without regard to his underlying intention or motivation." App'x at 1069. Importantly, however, that instruction related to the excessive force claim under Section 1983 against Sergeant McManus. We have no reason to believe that the jury would have assumed that such language would apply to a different defendant on different claims, especially where the actual instruction on the assault and battery claims not only omitted the critical language as it relates to this issue (that is, "objectively" and "without regard to his underlying intention or motivation") but also affirmatively told them that good faith *did* apply to those claims. *See, e.g.*, *Hudson v. New York City*, 271 F.3d 62, 69-70 (2d Cir. 2001) (holding that, even though the district court referenced "objective reasonableness" at some point in its instruction, it did not cure the defect caused by earlier reference to defendant's intent because it made it "confusing as to whether intent to do wrong was required to find a violation of [plaintiff's] Fourth

Amendment rights"). Therefore, we disagree with the City's assessment that the error in the instruction was "technical[]" or "minor." Appellee's Br. at 2, 18.

Moreover, we need not guess as to whether the jury was focused upon this particular instruction during their deliberations as it relates to the assault and battery claims involving Sergeant Mattera, because there was a note during deliberations that makes that focus abundantly clear. As noted above, at around 10:20 a.m. on the first day of deliberations, the jury sent a note, requesting to view all video evidence involving Sergeant Mattera at standard speed and in slow motion, and asking whether there is "anything unique about a police [officer] carrying out a law enforcement function (but not a lawful arrest) that should be considered when assessing an assault and battery claim." App'x at 1203. Tellingly, because the initial charge only referenced the reasonableness standard in the context of an arrest situation, the jury astutely sent this note asking what standard applied when the officer used force in a non-arrest situation, as they were simultaneously seeking to review evidence regarding Sergeant Mattera. In response to that note, the district court again repeated the erroneous instruction, thus advising the jury that the analysis included "whether the force was applied in good faith—in a good faith effort to maintain or restore discipline—or

47

maliciously for the very purpose of causing harm." *Id*. at 1105. The district court

then replayed the requested videos for the jury. At around 2:15 p.m., after several

additional hours of deliberation, the jury again requested to review video

recordings of the incident with Sergeant Mattera and also requested to review

transcripts of both Sergeant Mattera's and Tardif's testimony regarding their

encounter. After viewing the video of the encounter with Sergeant Mattera

multiple times and conducting additional deliberations over the course of the next

ninety minutes, the jury reached a verdict in favor of the City and the individual

defendants. In short, the substance and timing of the note, in the overall context

of the jury's undeniable focus on the evidence involving Sergeant Mattera,

together raise a substantial concern that the jury's decision on the assault and

battery claims involving Sergeant Mattera may have been impacted by the

erroneous instruction. *See, e.g.*, *Heath*, 854 F.2d at 8-9 (new trial required where the

district court gave an instruction when initially charging the jury, and again when

receiving a note, erroneously stating that a finding of malice was required for

plaintiff to prove the officer's unreasonable use of deadly force).

The receipt of the note and the potential effect of the erroneous instruction

are further magnified by the nature of the proof that the jury was considering as

to Sergeant Mattera's conduct, which could have naturally placed his intent at the forefront of the jury's discussions. Although the parties provided different accounts regarding the lead-up to Sergeant Mattera's grabbing of Tardif, Sergeant Mattera admitted that he "grabbed" Tardif, "pull[ed] her off to the side," which caused her body to "twist[] around," and that he then "lost grip of her and she fell down." App'x at 781, 797. A frame-by-frame video recording of the incident, although evolving rapidly, also shows Sergeant Mattera grabbed her. However, a significant portion of Sergeant Mattera's testimony related to his motivations and good faith, thereby implicating the erroneous instruction. For example, Sergeant Mattera testified that Tardif suddenly appeared in his field of vision and it looked like she was about to run into the back of another police officer. To "prevent the situation from further escalating," he "instinctively" used force against her in order to prevent a possible collision. *Id.* at 801. Sergeant Mattera further stated that he did not intend for Tardif to fall to the ground and that he was unable to break her fall. He also testified that he believed that he had used "the minimal amount of force that [he] needed to use."[17] *Id.* at 803.

---

[17] Although the City's summation primarily focused on the reasonableness of the officers' conduct without reference to mental state, we note that there was a reference in the summation to the officers not being "these cruel, violent monsters" as plaintiff implied, *id.* at 1050-51, which also could have, in combination with Sergeant Mattera's testimony

Given Sergeant Mattera's testimony, even if the jury credited Tardif's and Daniel Shockley's testimony and found that the degree of force employed by Sergeant Mattera was excessive under the circumstances, they could have also credited Sergeant Mattera's testimony and concluded that he had no bad motive in using the excessive force. Such findings, if considered in the context of the erroneous instruction, could have led the jury to find in Sergeant Mattera's favor because, even though he applied objectively *unreasonable* force, he did so "in a good faith effort to maintain or restore discipline" and not "maliciously for the very purpose of causing harm." *Id.* at 1105 (supplemental jury instruction). That verdict, if based on those findings and the erroneous instruction, would have been contrary to New York law and thus prejudiced Tardif. *See Dancy v. McGinley*, 843 F.3d 93, 119-20 (2d Cir. 2016) (holding that erroneous instruction that allowed consideration of subjective intent of the police officer was not harmless because "[u]nder the district court's instruction, the jury could have concluded that there was no violation because [the officer] did not intend to use enough force to break [plaintiff's] jaw"); *see also Callahan v. Wilson*, 863 F.3d 144, 152 (2d Cir. 2017)

---

and the faulty instruction, erroneously (though perhaps inadvertently) further focused the jury on the issues of subjective intent, such as good faith or malice. We further note that the City's summation was silent on whether the reasonableness standard was objective or subjective.

(holding that erroneous instruction on the use of deadly force was not harmless because it "allowed the jury to decide the case on different grounds than [the law] permits").

In reaching this decision, we recognize that it is also entirely possible that the jury's verdict in favor of the City on Sergeant Mattera's conduct could have been based upon a finding, entirely independent of his motive, that his use of force was objectively reasonable under the circumstances. To find harmless error, however, we must be "convinced that the error did not influence the jury's verdict." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000). That standard has simply not been met as it relates to the assault and battery claims pertaining to Sergeant Mattera when the erroneous instruction is considered, in light of the substance of the jury note and the nature of the proof surrounding his conduct. *See Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 439 (2d Cir. 1995) (holding that charging error required retrial because "[w]e d[id] not know what the jury would have done had it received a correct instruction"). Accordingly, Tardif is entitled to a new trial on the *respondeat superior* claim against the City based upon Sergeant Mattera's alleged assault and battery.

With respect to the assault and battery claims against Sergeant McManus, the focus of the evidence and issues were entirely different, and we thus find that the district court's charging error was clearly harmless. Unlike the testimony regarding the force used by Sergeant Mattera, the jury was presented with no evidence regarding Sergeant McManus's subjective intent for using force because he testified that he never used *any* force against Tardif. Sergeant McManus testified that he first noticed Tardif when she was on the ground approximately fifteen feet from him. He categorically and repeatedly denied having any physical contact with Tardif. *See, e.g.*, App'x at 827 ("Q. You didn't shove her in her chest while she was on crutches? A. No."); *id.* at 833 ("Q. But it's possible you made contact with her, isn't that right? A. No."); *id.* at 837-38 ("Q. Would you push a woman off of her crutches simply because she was asking you for the name of another officer? A. Absolutely not.").

To be sure, Tardif testified that Sergeant McManus came "through the [police] line . . . and . . . pushed" her off of her crutches while she was attempting to locate the officer from the incident earlier that morning. *Id.* at 905. However, if the jury credited Tardif's testimony, that gratuitous use of force would have been unreasonable no matter what the circumstances. In fact, in the City's summation,

Tardif's testimony was summarized as claiming "for no reason at all Sergeant McManus comes running out of the police line, his brow is furrowed, his skin is blazing red, and he is filled with rage, and he pushes her off her crutches like some villain from a Charles Dickens novel." *Id.* at 1037-38. The City, in addition to questioning Tardif's credibility as to whether any officer did that at all, argued to the jury (from the testimony and photos) that it could not have been Sergeant McManus.

Therefore, even in the face of these starkly different versions of events, the jury would have had no occasion under either version to consider whether Sergeant McManus subjectively used force in good faith, and thereby rely on the incorrect elements of the instruction. The only question—assuming the jury found that a police officer had gratuitously pushed Tardif off of her crutches—would have been whether Sergeant McManus was that officer or not. Given the limited nature of the evidentiary dispute regarding the claims against Sergeant McManus, we are confident that the erroneous instruction regarding subjective intent could not possibly have influenced the jury's verdict in Sergeant McManus's favor on those claims and, therefore, the error was harmless. *See, e.g.*, *Hill v. Kemp*, 833 F.2d 927, 930 (11th Cir. 1987) (holding that erroneous instruction on intent was harmless

where alibi defense was asserted and there was no argument that a lack of intent existed for the person who committed the offense); *Hill v. Quigley*, 784 F. App'x 16, 20 (2d Cir. 2019) (summary order) (holding that any error from reference to intent in a use of lethal force instruction was harmless because "intent was not at issue at trial"). Accordingly, no new trial is warranted as to the assault and battery claims against Sergeant McManus and the *respondeat superior* claim against the City related to his conduct based upon the erroneous instruction.

## CONCLUSION

For the reasons stated, we **AFFIRM** the judgment of the district court as to the ADA claim, as well as the assault and battery claims against Sergeant McManus and the related *respondeat superior* claim against the City arising from Sergeant McManus's alleged conduct, but **VACATE** the judgment as to the *respondeat superior* claim against the City relating to Sergeant Mattera's alleged assault and battery, and **REMAND** the case for further proceedings consistent with this opinion.